# ATTACHMENT A

Person/Attorney Filing: Gerald Maltz
Mailing Address: One South Church Ave., Suite 1000
City, State, Zip Code: Tucson, AZ 85701
Phone Number: (520)792-3836X120
E-Mail Address: gmaltz@mpfmlaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 004908, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

Justin Lane
Plaintiff(s),
v.
City of Tucson, et al.
Defendant(s).

Case No.  C20223324

**SUMMONS**

HON. GREG SAKALL

To: Chad Kasmar

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 8/11/2022

Gary Harrison
Clerk of the Superior Court

By:   ALAN WALKER /s/
          Deputy Clerk

AZturboCourt.gov Form Set #7091410

Person/Attorney Filing: Gerald Maltz
Mailing Address: One South Church Ave., Suite 1000
City, State, Zip Code: Tucson, AZ 85701
Phone Number: (520)792-3836X120
E-Mail Address: gmaltz@mpfmlaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 004908, Issuing State: AZ

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA

Justin Lane
Plaintiff(s),
v.
City of Tucson, et al.
Defendant(s).

Case No.  C20223324

**SUMMONS**

HON. GREG SAKALL

To: Kevin Hall

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1.  A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2.  If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
    Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
    Note: If you do not file electronically you will not have electronic access to the documents in this case.

3.  If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

AZturboCourt.gov Form Set #7091410

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 8/11/2022

Gary Harrison
Clerk of the Superior Court

By:   ALAN WALKER /s/
_____
          Deputy Clerk

AZturboCourt.gov Form Set #7091410

2

Person/Attorney Filing: Gerald Maltz
Mailing Address: One South Church Ave., Suite 1000
City, State, Zip Code: Tucson, AZ 85701
Phone Number: (520)792-3836X120
E-Mail Address: gmaltz@mpfmlaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 004908, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

Justin Lane
Plaintiff(s),
v.
City of Tucson, et al.
Defendant(s).

Case No.  C20223324

**SUMMONS**

HON. GREG SAKALL

To: Chris Magnus

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

AZturboCourt.gov Form Set #7091410

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 8/11/2022

Gary Harrison
Clerk of the Superior Court

By:   ALAN WALKER /s/
_____
Deputy Clerk

AZturboCourt.gov Form Set #7091410

2

Person/Attorney Filing: Gerald Maltz
Mailing Address: One South Church Ave., Suite 1000
City, State, Zip Code: Tucson, AZ 85701
Phone Number: (520)792-3836X120
E-Mail Address: gmaltz@mpfmlaw.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 004908, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

Justin Lane
Plaintiff(s),
v.
City of Tucson, et al.
Defendant(s).

Case No.  C20223324

**SUMMONS**

HON. GREG SAKALL

To: City of Tucson

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1.  A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2.  If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 110 West Congress Street, Tucson, Arizona 85701 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
    Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
    Note: If you do not file electronically you will not have electronic access to the documents in this case.

3.  If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

AZturboCourt.gov Form Set #7091410

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PIMA



SIGNED AND SEALED This Date: 8/11/2022

Gary Harrison
Clerk of the Superior Court

By:    ALAN WALKER /s/
_____
            Deputy Clerk

AZturboCourt.gov Form Set #7091410

2

PERSON/ATTORNEY FILING: Gerald Maltz

MAILING ADDRESS: One South Church Ave., Suite 1000

CITY, STATE, ZIP CODE: Tucson, AZ 85701

PHONE NUMBER: (520)792-3836X120

E-MAIL ADDRESS: gmaltz@mpfmlaw.com

[ ☐ ] REPRESENTING SELF, WITHOUT AN ATTORNEY

(IF ATTORNEY) STATE BAR NUMBER: 004908, Issuing State: AZ

FILED
Gary Harrison
CLERK, SUPERIOR COURT

8/11/2022 2:20:34 PM

BY: ALAN WALKER /S/
DEPUTY

Case No. C20223324
HON. GREG SAKALL

## ARIZONA SUPERIOR COURT, PIMA COUNTY

Justin Lane
Plaintiff(s),

V.

City of Tucson, et al.
Defendant(s).

**CASE NO**: _____

**RULE 102a FASTAR CERTIFICATE**

The undersigned certifies that he or she knows the eligibility criteria set by FASTAR Rule 101b

and certifies that this case:

## (NOTE – YOU MUST CHECK ONE OF THE BOXES BELOW OR THE CLERK WILL NOT ACCEPT THIS FORM.)

☐ **DOES** meet the eligibility criteria established by Rule 101b; or

☒ **DOES NOT** meet the eligibility criteria established by Rule 101b.

Dated: _____

Gerald Maltz /s/ _____
                  SIGNATURE

FILED
Gary Harrison
CLERK, SUPERIOR COURT
8/11/2022 2:20:34 PM
BY: ALAN WALKER /S/
DEPUTY

# In the Superior Court of the State of Arizona
# In and For the County of Pima

Case No. C20223324
HON. GREG SAKALL

**Plaintiff's Attorneys:**

Gerald Maltz - Primary Attorney
Bar Number: 004908, issuing State: AZ
Law Firm: Miller Pitt Feldman & McAnally, PC
One South Church Ave., Suite 1000
Tucson, AZ 85701
Telephone Number: (520)792-3836X120
Email address: gmaltz@mpfmlaw.com

Timothy P. Stackhouse
Bar Number: 030609, issuing State: AZ
Law Firm: Miller Pitt Feldman & McAnally, PC
Telephone Number: (520)792-3836

**Plaintiff:**

Justin Lane
One South Church Ave., Suite 1000
Tucson, AZ 85701
Telephone Number: (520)792-3836
Email address: tstackhouse@mpfmlaw.com

**Defendants:**

City of Tucson
P.O. Box 27210
Tucson, AZ 85726

Chris Magnus
P.O. Box 27210
Tucson, AZ 85701

Kevin Hall
P. O. Box 27210
Tucson, AZ 85726

Chad Kasmar
P. O. Box 27210
Tucson, AZ 85726

AZTurboCourt.gov Form Set #7091410

Discovery Tier t3

Case Category: Tort Non-Motor Vehicle
Case Subcategory: Section 1983

AZTurboCourt.gov Form Set #7091410

FILED
Gary Harrison
CLERK, SUPERIOR COURT
8/11/2022 2:20:34 PM
BY: ALAN WALKER /S/
DEPUTY

**MILLER, PITT, FELDMAN & McANALLY, P.C.**
One South Church Avenue, Suite 1000
Tucson, Arizona 85701
Gerald Maltz (4908)
Timothy P. Stackhouse (030609)
Telephone: (520) 792-3836
Facsimile: (520) 624-5080
gmaltz@mpfmlaw.com
tstackhouse@mpfmlaw.com
me@mpfmlaw.com
Attorneys for Plaintiff

Case No. C20223324
HON. GREG SAKALL

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF PIMA

| | |
|---|---|
| JUSTIN LANE, a married man, | Case No.: |
| Plaintiff, | |
| - vs - | **COMPLAINT** |
| CITY OF TUCSON, a municipal corporation; CHRIS MAGNUS, KEVIN HALL, CHAD KASMAR, | **Tier 3** |
| Defendants. | |

**Jurisdiction, Venue and Parties**

1.     Plaintiff Lieutenant Justin Lane (Lt. Lane) is a lieutenant with the Tucson Police Department (TPD).

2.     Defendant TPD Chief Chris Magnus (Chief Magnus) was the Chief of police for the TPD from January 2016 through December 2021.

3.     Defendant TPD Assistant Chief Hall (AC Hall) is an Assistant Chief with the TPD.

1

4.     Defendant TPD Chief Chad Kasmar (Chief Kasmar) has served as the Chief of TPD since December 2021 and formerly served as Deputy Chief.

5.     Defendant City of Tucson (COT) is a municipal corporation and a jural entity under the laws of Arizona.

6.     At all relevant times, all individual parties were residents of Pima County, Arizona.

7.     The individual defendants are COT officials with final decision-making authority on the matters described below; COT is liable for the violations of Lt. Lane's constitutional rights described below under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and *City of Phx. v. Yarnell*, 184 Ariz. 310 (1995).

8.     Venue and jurisdiction are proper in this Court.

**Facts Common to All Counts**

9.     Lt. Lane has been employed by TPD since 2001, when he started as a patrol officer.

10.    From 2001 to 2008, Lt. Lane received annual written performance evaluations, as required by City of Tucson Human Resources policy, all of which were satisfactory.

11.    Following 2008, in contravention of COT policy, TPD did not prepare written performance evaluations for Lt. Lane.

12.    Throughout the first 17 years of his career with TPD, Lane's performance was such that he was continually promoted.

13.    On March 18, 2018, Lt. Lane was promoted to Captain and placed in charge of TPD's Operations East Division (ODE).

2

14.     When Lt. Lane was promoted to Captain, Chief Magnus said the following: "I need to say that Justin was always fair, willing to dig as deep as necessary to get to all the facts, and someone highly committed to the high standards of our profession, as well as maintaining the excellent reputation of our agency.  I always knew I could count on him to be thorough, keep an open mind, handle cases with confidentiality, and hold his very important office to the highest possible standards...It has meant a lot to me to be able to trust and count on Justin."

15.     Throughout his tenure as captain, Lt. Lane received accolades and recognition from his peers, superiors, city leaders, and community members, including the following:

      a.   Odessa Draheim, assistant to Councilman Cunningham, October 1, 2018: "You and your team do outstanding work! I CC'd everyone in the office so they know. Thank you."

      b.   December 4, 2018, letter of appreciation addressed to TPD Chief Magnus commending Lt. Lane and his staff for resolving a problem with homeless individuals trespassing on private property.

      c.   Teresa Smith, Chief of Staff for Councilwoman Nikki Lee, to Deputy Chief Kasmar, August 13, 2019: "FYI:  Captain Lane is doing a really great job out here.  We have been hearing a lot of positive reports from our residents about how proactive and communicative he is.  He has been working really well with our office too.  Once Council can get them their SE substation and a few more officers, I think ODE will be in a REALLY great position."

d.  Karen Riggs, Tucson resident, to Mayor's Office, November 11, 2019: "I'm writing to express my gratitude for the recent work that the Eastside Police have done in closing down a meth house on my block. I would do this publicly, but the case is still open and being handled by the Counter Intelligence Alliance. The bust was coordinated by Captain Lane and I would be so grateful if you would give him a call and let him know that his efforts are appreciated. He diverted a lot of man-power for this, that the understaffed force could hardly spare. I thanked him but I think it would mean so much more, coming from you. Sgt. Hockstettler kindly coordinated with me as to my day-to-day concerns and also was present for the arrests…"

e.  Lt. Perrin nominated then Captain Lane to receive the Medal of Distinguished Service on January 31, 2020, stating: "Captain Lane is a respected leader and his positive attitude and focus on crime reeducation has reduced crime in the community and increased pride amongst the officers."

f.  Councilman Cunningham also wrote in support of Lt. Lane's nomination for the Medal of Distinguished Service: "I'd like to single out Captain Lane for his willingness to engage the public, either through community events or response to my office when there are constituent concerns.  This attitude has filtered down to the lieutenants, sergeants and officers under his command as well…My staff and I have been very appreciative of Captain

4

Lane's leadership and he deserves whatever recognition the Department gives him."

    g. AC Hall signed the Medal of Distinguished Service nomination for Lt. Lane, indicating he agreed with the nomination.

16.     Prior to August 2020, Lt. Lane had never received a negative performance evaluation.

17.     On July 17, 2019, Officer Alfred Anaya was involved in an "on-duty shooting" incident, in which Vincent Linarez was shot while attempting to flee in a vehicle.

18.     The Pima County Attorney's Office reviewed the incident and declined to file any criminal charges against Officer Anaya; Linarez was charged with multiple felony charges, including aggravated assault and endangerment.

19.     TPD's Office of Professional Standards ("OPS") conducted an independent investigation of Officer Anaya's actions relating to the shooting.

20.     OPS concluded that Officer Anaya violated TPD's use of force policy and recommended that Officer Anaya be terminated.

21.     In April 2020, Assistant Chief Silva asked Lt. Lane to perform an independent review of OPS's findings regarding Officer Anaya and recommend the appropriate discipline.

22.     Upon information and belief, this task was assigned to Lt. Lane, rather than a commander within Officer Anaya's chain of command, because Officer Anaya's superiors had been interviewed by OPS.

23.     Lt. Lane found that the OPS review was flawed in that it placed too much emphasis on the moment of the shooting and failed to consider the totality of the circumstances, as required by TPD's use of force policy.

24.     After reviewing all the factors leading up to the shooting, Lt. Lane concluded that the fault, if any, was due to a "general lack of supervision and leadership," which placed Officer Anaya and his fellow officers in a dangerous situation that they were not equipped to handle.

25.     Lt. Lane did not recommend discipline for Officer Anaya as he had been asked to do, but recommended that Officer Anaya be exonerated of the charge of violating TPD's use of force policy.

26.     Lt. Lane submitted a draft report with his findings and conclusions to Chief Magnus on May 5, 2020.

27.     On May 7, Deputy Chief Kasmar, Assistant Chief Silva, and Assistant Chief Hall called Lt. Lane to discuss his draft report; each chief disagreed with Lt. Lane's findings.

28.     Over the following week, Assistant Chief Silva continued to press Lt. Lane regarding the draft report, at one point stating, "I would never have expected this out of you."

29.     On May 15, 2020, Lt. Lane attended a meeting with Chief Magnus, AC Silva and Lt. Garza, and OPS officers Lt. Pegnato, Sgt.  Crowell, and  Sgt. Morales, regarding the draft report.

30.     During the course of the meeting, AC Silva and others pressured Lt. Lane to change his findings and affirm OPS's recommendation of terminating Officer Anaya.

6

31.     Following the meeting, Chief Magnus commended Lt. Lane on his articulate and thorough analysis of the Anaya shooting.

32.     On May 19, 2020, due to the discrepancy between the OPS findings and Lt. Lane's findings, Lt. Lane drafted a memorandum, separate and distinct  from the draft report, addressed to AC Hall, that summarized the reasons that Officer Anaya's use of deadly force did not violate TPD's policy.

33.     On May 25, 2020, the murder of George Floyd by the Minneapolis Police Department set off nationwide protest against police brutality, placing pressure on the COT and TPD to demonstrate that the TPD does not tolerate the use of excessive force by its officers.

34.     AC Hall subsequently drafted a memorandum addressing the Anaya shooting that advocated for the OPS findings and recommendations.

35.     Both memorandums were submitted to Chief Magnus.

36.     On June 3, 2020, Deputy Chief Kasmar invited Lt. Lane for coffee, ostensibly to discuss nonwork-related matters.

37.     At that meeting, Deputy Chief Kasmar informed Lt. Lane that he had created excess work for TPD's executive leadership team due to allegedly improper interactions with other commanders and reprimanded Lt. Lane for not attending a weeklong seminar provided by an organization of which Chief Magnus is a member (despite previously acknowledging that Lt. Lane had a valid reason for not attending).

38.     Deputy Chief Kasmar concluded the meeting by telling Lt. Lane that his findings related to the Anaya shooting relied on an outdated use of force policy, and

7

threatened to demote Lane from Captain to Lieutenant if he did not change his report to align with the OPS's findings and recommendations.

39.     The "totality of the circumstances" standard that Lt. Lane applied to the Anaya shooting had been in TPD's use of force policy during the entirety of Lt. Lane's time with the TPD.

40.     None of Lt. Lane's superiors could identify a more recent use of force policy than the one applied by Lt. Lane.

41.     The following day, Lt. Lane contacted AC Hall regarding Deputy Chief Kasmar's threats.

42.     AC Hall acknowledged that he was aware of Lt. Lane's meeting with DC Kasmar, but AC Hall alleged that other captains were frustrated with Lt. Lane, in particular due to not offering assistance with protests related to the recent George Floyd killing in Minnesota.

43.     Lt. Lane then contacted his peer captains regarding AC Hall's allegations; Captains Dennison, Strader, and Ronstadt each denied any frustrations with Lt. Lane.

44.     On June 8, 2020, after reviewing Lt. Lane's and AC Hall's memorandums, Chief Magnus approved AC Hall's memorandum.

45.     Lt. Lane was instructed to submit an official report consistent with the OPS's findings.

46.     On June 16, 2020, Lt. Lane submitted his official report relating to the Anaya shooting.

47.     The report was consistent with Lt. Lane's draft report and recommended that Officer Anaya be exonerated for his use of force because it did not violate the TPD's deadly force policy in effect at the time.

48.     Lt. Lane's final report went on to state: "Assistant Chief Hall disagreed with the chain of command review determination that Officer Anaya's use of force was justified and within department policy. Chief Magnus concurred. As such, Officer Anaya's conduct in this instance remains within the category of severe misconduct and requires a discipline recommendation independent of my finding. I therefore recommend the presumptive sanction of termination per the Discipline Guide."

49.     Lt. Lane concluded his report by "encourag[ing] the department to convene a Sentinel Event Review Board (SERB) to examine training, tactics and supervision specific to this incident. As indicated, I believe this incident was complicated by the decision of the COC to tackle a rather sophisticated group of career criminals who have proven themselves to be exceptionally dangerous and violent."

50.     Officer Anaya was terminated in July 2020.

51.     On June 22, 2020, after the decision to fire Officer Anaya had been made, Chief Magnus requested a telephonic meeting with Lt. Lane.

52.     At that meeting, Chief Magnus stated that in the Civil Service Commission hearing Officer Anaya would request following his termination, Lt. Lane's testimony would be Anaya's "Exhibit A" and his report "Exhibit B."

53.     Officer Anaya promptly filed a grievance claim and sought to be reinstated.

9

54.    Officer Anaya's appeal of this termination required a hearing before the Civil Service Commission, which was scheduled to begin on September 9, 2020.

55.    Upon information and belief, following Officer Anaya filing for an appeal, Chief Magnus and/or assistant chiefs, and other TPD personnel, met with City of Tucson Attorneys regarding how to retaliate against Lt. Lane for his anticipated testimony in Anaya's forthcoming hearing, and for Lt. Lane's findings relating to the shooting. They were advised to prepare a negative performance evaluation to justify demoting Lt. Lane.

56.    On August 10, 2020, Lt. Lane was summoned to meet with AC Hall and DC Kasmar; they informed him that he would be demoted to lieutenant effective August 16, 2020.

57.    The demotion was to be supported by a performance evaluation that AC Hall could not provide at the time, which he claimed was due to a printer malfunction.

58.    AC Hall and Chief Magnus prepared the negative performance evaluation to create a pretext for demoting Lt. Lane from Captain to Lieutenant.

59.    Lt. Lane received the evaluation by email in the evening of August 10, 2020.

60.    On August 11, 2020, Lt. Lane signed the evaluation "with objection" and returned it to AC Hall.

61.    The evaluation contained numerous false statements, of which Lt. Lane immediately informed AC Hall.

62.    On August 13, 2020, AC Hall informed Lt. Lane he would remove some of the false statements and provide a revised evaluation, which was sent to Lt. Lane on August 14.

63.    AC Hall destroyed the original evaluation and prepared a new evaluation in its place, rather than amending it, as required by TPD policy.

64.    The revised evaluation removed an allegation that Lt. Lane had not contacted the newly elected councilwoman in Ward 4, after the councilwoman's chief of staff personally informed DC Kasmar of the inaccuracy of that claim and expressed her support of Lt. Lane.

65.    The revised evaluation still contained numerous false, inaccurate, and misleading claims and omissions, including the following:

    a.    "[Captain Lane] spent a great deal of time and effort on this initiative [Neighborhood Crimes Unit (NCU)], and his focus was such that I reminded him at one point he was responsible for an entire division, not one squad."

        i.    This claim omits the overall effectiveness of the changes Captain Lane made to the NCU and the importance of the unit to the entire police department. Moreover, Captain Lane placed great emphasis on enhancing the working relationship between the NCU and Community Response Team (CRT), which AC Hall viewed as so effective he requested all field captains adopt Captain Lane's strategy.

    b.    "I [AC Hall] was present at a Ward office meeting with councilmember and constituents, and Captain Lane was asked to speak to the group. It was evident that he was unprepared and came off as aloof and officious, but

11

more concerning was that his comments did not reflect well on the agency. While this may seem subjective, I discussed the presentation with others in attendance and received similar feedback. In the following week, I spoke to Captain Lane about the speaking event and my observations. He was not particularly receptive and somewhat defensive but did eventually concede that he needed to improve in the arena of public speaking."

    i.  Upon information and belief, AC Hall never provided any feedback to Captain Lane regarding any public speaking engagement. The lone community event AC Hall attended in which Captain Lane spoke was a Ward 2 town hall meeting on May 16, 2018. Chief Magnus highlighted Captain Lane's presentation on his Twitter page. On other occasions, Captain Lane received positive feedback from TPD's community engagement coordinator for his community presentations.

c.  "What I find most concerning about this example [re Lt. Lane's crime reduction model] is the apparent belief, manifested by Captain Lane's behavior, that he seemingly does not or cannot recognize the worth of ideas or concepts that conflict with his own."

    i.  During Lt. Lane's tenure as Captain, AC Hall never redirected his strategy nor offered any alternative methods. The only feedback provided were general statements of approval, such as "I'm happy with everything you're doing."

12

d.  "Captain Lane accepted no responsibility, as a senior level police executive, to mitigate and resolve this issue [re Lt. Brady] without the intervention of executive leadership."

   i.  Lt. Brady demanded the meeting with AC Hall, after hanging up on Captain Lane while discussing a disagreement regarding Captain Lane's secretary's duties. Captain Lane contacted AC Hall and requested he be allowed to resolve the issue himself without the intervention of executive leadership, but AC Hall refused and insisted that the issue be resolved through the intervention of executive leadership.

e.  "Captain Lane correctly attempted to address the issue with the sergeant's lieutenant, Lt. Wildblood. The interaction quickly became contentious between Captain Lane and Lt. Wildblood, eventually resulting in an OPS investigation."

   i.  AC Hall omitted the fact that Lt. Wildblood and the sergeant were known to be insubordinate, and AC Hall believed that an OPS investigation into their conduct—not Captain Lane's, as implied in the performance evaluation—was necessary. AC Hall further omitted that the Chief's office requested the OPS investigation, and that Captain Lane agreed to handle it informally. AC Hall omits that the OPS investigation resulted in discipline for both the sergeant and

13

Lt. Wildblood, and AC Hall subsequently commended Captain Lane for how he handled the situation.

f.   "Captain Lane and I have had several conversations, both in the context of the FSB weekly meetings and in other settings, regarding the importance of community engagement as the foundation for TPD's community policy model as well as for robust crime prevention and crime reduction models….I remain unimpressed with the level of community engagement by ODE command staff…Captain Lane routinely referred to community engagement as a traditional DAC or NHA meeting, and that was as far as I saw engagement go in ODE."

   i.   Captain Lane increased community engagement while leading the ODE. On many occasions, council members and community members reached out to Captain Lane and executive leadership team members to commend the work Captain Lane was doing in their community. AC Hall omits that he never attended a singled ODE DAC meeting, nor ever provided any feedback regarding the level of ODE's community engagement.

g.   "I offer this [Palo Verde Neighborhood Association event in March 2019] as an example that was repeated both before and after this event with different opportunities for ODE staff to reach out. Yet, they failed to recognize, search for, or create these incredibly important opportunities to meaningful and intentional relationships with the community they serve."

14

i. While Captain Lane was unaware of the specific event mentioned by AC Hall, AC Hall omits the fact that the Palo Verde Neighborhood Association was one of the first organizations Lt. Lane reached out to after being promoted to Captain, and he continued to engage with the association and community. AC Hall omits that Councilman Cunningham said the following about Captain Lane in support of his nomination for the Medal of Distinguished Service, which AC Hall signed and endorsed: "…*I'd like to single out Captain Lane for his willingness to engage the public, either through community events or response to my office when there are constituent concerns…*"

h. "To sum up my disappointment with the lack of community engagement on the part of the entire ODE command staff I would point to one sentence that has been in the division monthly memo for several months under the heading of Community Engagement, '*Due to COVID-19 restrictions Community Engagement is on hold.*' Where other division commanders have held a variety of community forums and meetings virtually or in small groups and continued to find creative ways to interreact with the community ODE simply put the community 'oh hold.'"

i. AC Hall omits the fact that large, in-person meetings/events were canceled pursuant to directions from Chief Magnus and the Mayor. Captain Lane arranged for virtual neighborhood association meetings and was in the process of scheduling a virtual DAC

meeting when he was demoted. Community engagement was never placed "on hold."

   i.  "…lack of engagement with [Captain Lane's] peers (failing to ask if assistance was needed when his peers worked 15 hour days with only one day off during recent civil disturbances)…"

      i.  Although Captain Lane did not offer unsolicited aid, AC Hall omits that Captain Lane did assist the incident commander when called upon during that time. AC Hall further omits that commanders are to provide assistance upon requests from the incident commander and not offer unsolicited aid, because doing so unnecessarily complicates the incident command system.

66.    In addition to the above, the negative performance evaluation contained numerous subjective views, in violation of TPD policy requiring performance evaluations to be objective.

67.    The negative performance evaluation covers the entire two-and-a-half-year period Lt. Lane was a Captain; during that time, Captain Lane was not served with a single notice of substandard performance prior to the performance evaluation, as required by TPD policy.

68.    The negative evaluation became a part of Lt. Lane's personnel file, a public record under Arizona law.

69.    Lt. Lane's pay was reduced by over 10% with the demotion, which contradicts TPD's policy to not reduce pay when an officer if involuntarily reclassified for reasons other

16

than disciplinary action, and, in the case of disciplinary action, not to reduce the employee's pay more than the new rank's classification.

70. A demotion requires TPD to complete a Personal Action Request Form, which contains information regarding the employees pay and justifications for it, and requires numerous signatures from TPD leadership and others, all of which were lacking from Lt. Lane's form.

71. From September 9 through September 16, 2020, the Tucson Civil Service Commission held a hearing regarding Officer Anaya's termination.

72. Officer Anaya subpoenaed Lt. Lane to testify on his behalf at the hearing.

73. Officer Anaya admitted Lt. Lane's report and memorandum as an exhibit in support of his position at the hearing.

74. Pursuant to a lawfully issued subpoena, on September 11, 2020, Officer Anaya called Lt. Lane to testify on his behalf.

75. As anticipated by Chief Magnus and the executive leadership team, Lt. Lane testified consistently with his report and memorandum, stating that Officer Anaya did not violate the existing TPD use of deadly force policy.

76. On September 16, 2020, a unanimous Civil Service Board overturned Officer Anaya's termination and reinstated him, ruling in part, "Officer Anaya's actions were fully justified based on the totality of the circumstances and he acted in a reasonable manner he was presented (sic)."

77.     Following the hearing, Chief Magnus publicly stated: "The content of [Lt. Lane's] testimony is a problem for the department," and added that the city cannot discipline employees based on the content of their testimony, as it can appear retaliatory.

78.     On November 25, 2020, TPD amended its use of force policy to remove the "totality of the circumstances" standard.

79.     On November 26, 2020, AC Strader ordered Lt. Lane to initial the revised use of force policy "out of an abundance of caution," before a witness, Capt., Leavitt; no other TPD officer was required to initial the new policy.

80.     In January 2022, Lt. Lane applied for one of three vacant captain positions, as instructed by DC Kazmierczak.

81.     Lt. Lane was informed by AC Strader that he was not selected for any of the open captain positions; no explanation was given.

82.     On April 4, 2022, Lt. Lane submitted a formal allegation of misconduct relating to the false and misleading claims in the negative performance evaluation prepared by AC Hall.

83.     On May 27, 2022, Chief Kasmar told Lt. Lane that no investigation would take place.

## Count I

### 42 U.S.C.A. §1983—First Amendment Retaliation

84.     The shooting involving Officer Anaya was a matter of public concern, as was the applicability of TPD's use of force policy to the facts, the subsequent termination of Officer Anaya, and the Civil Service Commission hearing.

18

85.   Lt. Lane testified as a private citizen under a subpoena at the Civil Service Commission hearing.

86.   Lt. Lane spoke in direct contravention of his superiors' orders when he did not change his findings regarding the Anaya shooting and use of force policy, and included his conclusions in his official report, and therefore spoke as private citizen.

87.   When Officer Anaya appealed his termination, Chief Magnus and the executive leadership team knew it would result in a hearing before the Civil Service Commission, and reasonably anticipated that Lt. Lane's report and memorandum would be used as exhibits at the hearing, and that Lt. Lane would testify consistent with those documents.

88.   Chief Magnus and AC Hall demoted Lt. Lane to lieutenant in retaliation for his forthcoming testimony at the Anaya hearing and in an effort to place a prior restraint on that testimony.

89.   Chief Magnus and AC Hall demoted then Captain Lane to lieutenant in retaliation for his memorandum and report because it would provide Officer Anaya with substantial evidence to support his appeal.

90.   Chief Magnus and AC Hall demoted then Captain Lane to Lieutenant in an effort to place a prior restraint on Lt. Lane's testimony at the Anaya hearing.

91.   As evidenced by Chief Magnus' public remarks regarding discipline of Lt. Lane following the hearing being retaliatory, it was necessary for Chief Magnus and AC Hall to demote Lt. Lane prior to his public testimony to attempt to avoid violating policy and the law.

92.     The acts described above were carried about by City of Tucson officials with the final authority to make the determination regarding Lt. Lane's demotion and the negative performance evaluation, including Chief Magnus and TPD's executive leadership team.

93.     As final policy makers, the City of Tucson is liable for the wrongful conduct of TPD's Chiefs and the executive leadership team because their official status cloaks them with the City's authority.

94.     As a result of Defendants' wrongful retaliation, Lt. Lane has suffered a demotion, a pay decrease in contradiction of TPD policy, decreased responsibility, harm to his reputation among his current employer, future potential employers, and the public at large, been denied the opportunity to be promoted to the rank of captain within the TPD, and been deprived the opportunity to pursue his chosen career as a law enforcement officer to its highest level.

## Count II

### 42 U.S.C.A. §1983—Due Process – Liberty Interest

95.     Lt. Lane had a liberty interest in his continued employment and pay rate as a Captain with the TPD, and in his reputation.

96.     The negative performance evaluation contained numerous false statements that were injurious to Lt. Lane's reputation, as described above, including the allegation that Lt. Lane abused his authority when interacting with subordinates.

97.     The negative performance evaluation was coupled with a demotion.

98.     The negative performance evaluation is a public record under Arizona law.

20

99.     As a result of the demotion, Lt. Lane has suffered a pay decrease, in contradiction of TPD policy, decreased responsibility, and been deprived the opportunity to pursue his chosen career as a law enforcement officer to its highest level.

100.    As a result of the negative performance evaluation, Lt. Lane has suffered harm to his reputation among his current employer, future potential employers, and the public at large.

101.    As a result of the negative performance evaluation, Lt. Lane has further been denied the opportunity to be promoted to the rank of captain within the TPD.

102.    When AC Hall made the negative performance evaluation part of Lt. Lane's personnel file, he knew, or should have known, it would be a public record.

103.    Chief Kasmar's refusal to investigate the misconduct allegation filed by Lt. Lane regarding AC Hall's false and defamatory statements in the negative performance evaluation deprived Lt. Lane of an opportunity to clear his name.

104.    The acts described above were carried about by individuals with the final authority to make the determination regarding Lt. Lane's demotion and the negative performance evaluation, including Chief Magnus and TPD's executive leadership team.

105.    As final policy makers, the City of Tucson is liable for the wrongful conduct of TPD's Chiefs and the executive leadership team because their official status cloaks them with the City's authority.

. . .

. . .

. . .

21

**Count III**

<u>42 U.S.C.A. §1983—Due Process – Property Interest</u>

106.   Under Arizona law, Lt. Lane had a property interest in his continued employment and pay rate as a Captain with the TPD.

107.   Under Arizona law, Lt. Lane could only be demoted for "just cause," as defined in A.R.S. § 38-1101.

108.   Under TPD policy, Lt. Lane's pay could only be deducted if the demotion was voluntary or the result of disciplinary action.

109.   Lt. Lane's demotion lacked just cause because he was not informed of the possible disciplinary action resulting from his conduct through TPD manuals,  handbooks, or rules and regulations or other communications to Lt. Lane,  nor was the conduct such that Lt. Lane should have reasonably known disciplinary action could occur.

110.   The demotion was purportedly based on the negative performance evaluation, which was not required per TPD policy, and, as described above, was not supported by a preponderance of the evidence, but based on false, inaccurate, and misleading claims and omissions.

111.   The demotion was not voluntary or disciplinary, and Lt. Lane's pay should not have been reduced, and in no event should it have been reduced more than 7%.

112.   Lt. Lane's demotion from captain to lieutenant deprived him of his property interest in his continued employment, pay rate, and pension contributions as a captain without due process.

. . .

22

113.   The acts described above were carried about by City of Tucson officials with the final authority to make the determination regarding Lt. Lane's demotion, pay cut, and the negative performance evaluation, including Chief Magnus and TPD's executive leadership team.

114.   As final policy makers, the City of Tucson is liable for the wrongful conduct of TPD's Chiefs and the executive leadership team because their official status cloaks them with the City's authority.

WHEREFORE, Plaintiff Justin Lane requests judgment against Defendants as follows:

A.  For special damages;

B.  For compensatory damages;

C.  For attorney's fees;

D.  For taxable costs;

E.  For pre and post judgment interest; and

F.  Such other relief as is just and proper.

Dated this 11th day of August, 2022.

MILLER, PITT, FELDMAN & McANALLY, P.C.


By */s/ Gerald Maltz*_____
      Gerald Maltz
      Timothy P. Stackhouse
      Attorney for Plaintiff

23

# CERTIFICATE OF SERVICE

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

22 AUG 17  PM 5: 23

S. CASTILLO, DEPUTY

**Client Info:**

MILLER PITT FELDMAN & MCANALLY PC
GERALD MALTZ SBN: 4908
ONE S CHURCH AVENUE SUITE 1000
Tucson, AZ  85701
520-792-3836
Attorney For Plaintiff

**Case Info:**

| | |
|---|---|
| **Plaintiff:** | PIMA COUNTY SUPERIOR COURT |
| JUSTIN LANE | Court Division: CIVIL |
| -versus- | County of Pima, Arizona |
| **Defendant:** | |
| CITY OF TUCSON, et. al. | Issuance Date: 8/11/2022 Court Case # **C20223324** |

**Service Info:**

**Date Received:** 8/16/2022 at 11:36 AM
**Service:** I Served **KEVIN HALL, by service upon SUZANNE MESICH, CITY CLERK**
With: **SUMMONS; COMPLAINT; CIVIL COVER SHEET; FASTAR CERTIFICATE**
by leaving with **RICK GUERRA, DEPUTY CITY CLERK, STATED AUTHORIZED TO ACCEPT**

**At Business 255 W. ALAMEDA TUCSON, AZ 85701**
On 8/16/2022 at 01:45 PM
**Manner of Service: GOVERNMENT SERVICE**
Government Service was performed by delivering a true copy of this process, with the date and hour of service endorsed thereon by
me, and a copy of the complaint, petition, or other initial pleading or paper to **RICK GUERRA**  as **DEPUTY CITY CLERK, STATED
AUTHORIZED TO ACCEPT** of the within named to wit: **KEVIN HALL, by service upon SUZANNE MESICH, CITY CLERK**

**Served Description:  (Approx)**

Age: **50-55**, Sex: **Male**, Race: **Hispanic**, Height: **5' 9"**, Weight: **160**, Hair: **Black** Glasses:  **Yes**

**Charges:**

1st  Address-Second service (1)  $35.00
TOTAL: $35.00

I **RONALD R EZELL** acknowledge that I am authorized to serve process, in good standing in the jurisdiction wherein the process
was served and I have no interest in the above action. Under penalties of perjury, I declare that I have read the foregoing
document and that the facts stated in it are true.

Signature of Server:
**RONALD R EZELL**
Lic # **PM016-Pima County**

**Specialized Attorney Services, Inc.**
360 N. COURT AVE.
Tucson, AZ 85701
Phone: (520) 624-2466

Our Job # **136752**    Client Ref # **58185-0001**

1 of 1

# CERTIFICATE OF SERVICE

*FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

22 AUG 17 PM 5: 23

S. CASTILLO, DEPUTY

**Client Info:**

MILLER PITT FELDMAN & MCANALLY PC
GERALD MALTZ SBN: 4908
ONE S CHURCH AVENUE SUITE 1000
Tucson, AZ 85701
520-792-3836
Attorney For Plaintiff

**Case Info:**

| | |
|---|---|
| **Plaintiff:**<br>JUSTIN LANE<br>   -versus-<br>**Defendant:**<br>CITY OF TUCSON, et. al. | PIMA COUNTY SUPERIOR COURT<br>Court Division: CIVIL<br>County of Pima, Arizona<br><br>Issuance Date: 8/11/2022 Court Case # **C20223324** |

**Service Info:**

**Date Received: 8/16/2022** at **11:41 AM**
**Service:** I Served **CHAD KASMAR, by service upon SUZANNE MESICH, CITY CLERK**
With: **SUMMONS; COMPLAINT; CIVIL COVER SHEET; FASTAR CERTIFICATE**
by leaving with **RICK GUERRA, DEPUTY CITY CLERK, STATED AUTHORIZED TO ACCEPT**

**At Business 255 W. ALAMEDA TUCSON, AZ 85701**
On **8/16/2022** at **01:45 PM**
**Manner of Service: GOVERNMENT SERVICE**
Government Service was performed by delivering a true copy of this process, with the date and hour of service endorsed thereon by me, and a copy of the complaint, petition, or other initial pleading or paper to **RICK GUERRA** as **DEPUTY CITY CLERK, STATED AUTHORIZED TO ACCEPT** of the within named to wit: **CHAD KASMAR, by service upon SUZANNE MESICH, CITY CLERK**

**Served Description:  (Approx)**

Age: **50-55**, Sex: **Male**, Race: **Hispanic**, Height: **5' 9"**, Weight: **160**, Hair: **Black** Glasses:  **Yes**

**Charges:**

1st  Address (1)  $75.00
TOTAL: $75.00

I **RONALD R EZELL** acknowledge that I am authorized to serve process, in good standing in the jurisdiction wherein the process was served and I have no interest in the above action. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Signature of Server:
**RONALD R EZELL**
Lic # **PM016-Pima County**

**Specialized Attorney Services, Inc.**
360 N. COURT AVE.
Tucson, AZ 85701
Phone: (520) 624-2466

Our Job # **136754**    Client Ref # **58185-0001**

# CERTIFICATE OF SERVICE

FILED
GARY L. HARRISON
CLERK, SUPERIOR COURT

22 AUG 17 PM 5:23

S. CASTILLO, DEPUTY

**Client Info:**

MILLER PITT FELDMAN & MCANALLY PC
GERALD MALTZ SBN: 4908
ONE S CHURCH AVENUE SUITE 1000
Tucson, AZ 85701
520-792-3836
Attorney For Plaintiff

**Case Info:**

| | |
|---|---|
| **Plaintiff:**<br>JUSTIN LANE<br>-versus-<br>**Defendant:**<br>CITY OF TUCSON, et. al. | PIMA COUNTY SUPERIOR COURT<br>Court Division: CIVIL<br>County of Pima, Arizona<br><br>Issuance Date: 8/11/2022 Court Case # **C20223324** |

**Service Info:**

**Date Received: 8/16/2022 at 11:25 AM**
**Service:** I Served **CITY OF TUCSON, by service upon SUZANNE MESICH, CITY CLERK**
With: **SUMMONS; COMPLAINT; CIVIL COVER SHEET; FASTAR CERTIFICATE**
by leaving with **RICK GUERRA, DEPUTY CITY CLERK, STATED AUTHORIZED TO ACCEPT**

**At Business 255 W. ALAMEDA TUCSON, AZ 85701**
On **8/16/2022** at **01:45 PM**
**Manner of Service: GOVERNMENT SERVICE**
Government Service was performed by delivering a true copy of this process, with the date and hour of service endorsed thereon by me, and a copy of the complaint, petition, or other initial pleading or paper to **RICK GUERRA** as **DEPUTY CITY CLERK, STATED AUTHORIZED TO ACCEPT** of the within named to wit: **CITY OF TUCSON, by service upon SUZANNE MESICH, CITY CLERK**

**Served Description: (Approx)**

Age: **50-55**, Sex: **Male**, Race: **Hispanic**, Height: **5' 9"**, Weight: **160**, Hair: **Black** Glasses: **Yes**

**Charges:**

1st  Address-Third service (1)  $35.00
TOTAL: $35.00

I **RONALD R EZELL** acknowledge that I am authorized to serve process, in good standing in the jurisdiction wherein the process was served and I have no interest in the above action. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Signature of Server:
**RONALD R EZELL**
Lic # **PM016-Pima County**

**Specialized Attorney Services, Inc.**
360 N. COURT AVE.
Tucson, AZ 85701
Phone: (520) 624-2466

Our Job # **136746**   Client Ref # **58185-0001**

FILED
Gary Harrison
CLERK, SUPERIOR COURT
8/30/2022 3:13:35 PM
BY: ALAN WALKER /S/
DEPUTY

1   **MILLER, PITT, FELDMAN & McANALLY, P.C.**

2   One South Church Avenue, Suite 1000

3   Tucson, Arizona 85701                                    Case No. C20223324
    Gerald Maltz (4908)                                      HON. GREG SAKALL

4   Timothy P. Stackhouse (030609)

5   Telephone: (520) 792-3836
    Facsimile: (520) 624-5080

6   gmaltz@mpfmlaw.com

7   tstackhouse@mpfmlaw.com
    me@mpfmlaw.com

8   Attorneys for Plaintiff

9

10              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

11                  **IN AND FOR THE COUNTY OF PIMA**

12

13   JUSTIN LANE, a married man,            Case No.: C20223324

14              Plaintiff,                  **AFFIDAVIT OF SERVICE**

15
     - vs -
16                                          *(Honorable Judge Sakall)*

17   CITY OF TUCSON, a municipal
     corporation; CHRIS MAGNUS, KEVIN       **Tier 3**
18   HALL, CHAD KASMAR,

19
                Defendants.
20

21

22   STATE OF ARIZONA        )
                             )  ss.
23   COUNTY OF PIMA          )

24

25       Pursuant to Rule 4.2(c)(1), *Arizona Rules of Civil Procedure,* GERALD MALTZ,

26   being first duly sworn upon his oath, states as follows:

27
         1. Defendant, CHRIS MAGNUS, is known to be located outside the State of
28
            Arizona, but within the United States;
29

                                            1

2. The Summons, Complaint, Civil Coversheet and FASTAR Certificate were mailed by my office to CHRIS MAGNUS, at his personal residence by certified mail, return receipt requested.

3. I received the signed return receipt, which is attached as Exhibit A, and which indicates that a person received and signed for the described documents at Defendant Magnus' personal residence.

4. The date of the signed return receipt is August 22, 2022.

DATED this 30th day of August, 2022.



Gerald Maltz

SUBSCRIBED AND SWORN to before me this 30th day of August, 2022, by Gerald Maltz.

Eleanore S Ryan
Notary Public

My Commission Expires:



Eleanore S. Ryan
Notary Public
Pima County, Arizona
My Comm. Expires 11/2/2023
Commission No. 571790

2



UNITED STATES POSTAL SERVICE CAPITAL DISTRICT 208

22 AUG 2022PM 1 L

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

MILLER, PITT, FELDMAN & McANALLY, P.C.
One South Church Ave., Suite 1000
Tucson, Arizona 85701-1620

RECEIVED
AUG 29 2022
MILLER, PITT, FELDMAN & McANALLY, P.C.

TPS/cs (Lane)

-168099

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature X Joseph Morgan ☑ Agent ☐ Addressee<br>B. Received by (*Printed Name*) Joseph Morgan<br>C. Date of Delivery 8-22-22 |
| 1. Article Addressed to:<br>Christopher J. Magnus<br>5106 14th St. NW<br>Washington, DC<br>20011 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br>3. Service Type<br>☒ Certified Mail ☐ Express Mail<br>☐ Registered ☒ Return Receipt for Merchandise<br>☐ Insured Mail ☐ C.O.D.<br>4. Restricted Delivery? *(Extra Fee)* ☐ Yes |
| 2. Article Number<br>*(Transfer from service label)* | 7013 3020 0001 8839 6528 |

PS Form 3811, February 2004 Domestic Return Receipt 102595-02-M-1540

# EXHIBIT A