**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Justin Lane, a married man, | No. **CV-22-00394-TUC-BGM** |
| Plaintiff, | |
| - vs - | **ORDER** |
| City of Tucson, a municipal corporation; Chris Magnus; Kevin Hall; Chad Kasmar; | |
| Defendants. | |

      Pending before the Court is the Rule 12(b)(6) Motion to Dismiss (Doc. 13) filed by Defendants City of Tucson, a municipal corporation; Kevin Hall; Chris Magnus; and Chad Kasmar (collectively, "Defendants"). Plaintiff Justin Lane ("Plaintiff") filed Plaintiff's Opposition to Motion to Dismiss (Doc. 16), and Defendants replied (Doc. 18).

      Pursuant to 28 U.S.C. § 636(c), and Rule 73.1 of the Local Rules of Civil Procedure,[1] the parties consented to magistrate jurisdiction.

      The Court denies Defendants' Motion to Dismiss (Doc. 13).

---

[1] Rules of Practice of the United States District Court for the District of Arizona.

## I.  BACKGROUND

Plaintiff Justin Lane began his career in 2001 as a patrol officer with the City of Tucson Police Department (TPD).  In addition to naming the City of Tucson, a municipal corporation, as a Defendant in this matter, Plaintiff also named three additional individuals: Chris Magnus, Chad Kasmar, and Kevin Hall, all of whom are, or were employed with TPD.  According to the Complaint (Doc. 1-3), Magnus, Kasmar, and Hall, held the following titles with TPD during the relevant period:

**2016**  **2017**  **2018**  **2019**  **2020**  **Dec. 2021**          **Dec. 2021**     **Aug. 2022**

Chris Magnus, Chief (**Chief Magnus**)                    Chad Kasmar, Chief (**Chief Kasmar**)
                                                                                          *formerly* Deputy Chief

Chad Kasmar, Deputy Chief (**Deputy Kasmar**)

Kevin Hall, Assistant Chief (**Assist. Hall**)

On March 18, 2018, Plaintiff was promoted from Lieutenant to Captain and placed in charge of TPD's Operations East Division (ODE).  Two-and-a-half years later, Plaintiff was re-assigned back to the rank of Lieutenant effective August 16, 2020.  Plaintiff's re-assignment involved Plaintiff's written review of, and, thereafter, testimony to, an officer-related shooting that occurred on July 17, 2019.  TPD's Office of Professional Standards (OPS) conducted an independent investigation of the July 17, 2019 shooting, and found that [Officer A] had violated TPD's use of force policy and recommended that [Officer A] be terminated.  In April 2020, Plaintiff was asked to perform a review, independent from OPS, of [Officer A's] conduct.

On May 5, 2020, Plaintiff submitted a draft report of his findings and conclusions regarding [Officer A] to Chief Magnus.  To supplement his May 5, 2020 draft report, on

May 19, 2020 Plaintiff submitted a memorandum addressed to Assist. Hall that summarized Plaintiff's reasoning regarding [Officer A's] use of deadly force and why Plaintiff found [Officer A's] conduct did *not* violate TPD's policy, *contrary* to OPS's findings. Thereafter, Assist. Hall drafted a memorandum that advocated for the OPS findings and recommendations. Both memorandums were submitted to Chief Magnus. On June 8, 2020, after reviewing Plaintiff's and Assist. Hall's memorandums, Chief Magnus approved Assist. Hall's memorandum. On June 16, 2020, Plaintiff submitted his official report—including Plaintiff's finding that [Officer A] did *not* violate TPD's use of force policy—in addition to, the following language, in pertinent part:

> [Assist. Hall] disagreed with the chain of command review determination that [Officer A's] use of force was justified and within department policy. Chief Magnus concurred. As such, [Officer A's] conduct in this instance remains within the category of severe misconduct and requires a discipline recommendation independent of my finding. I therefore recommend the presumptive sanction of termination per the Discipline Guide.

Compl. at 9, ¶ 48 (Doc. 1-3).

[Officer A] was subsequently terminated in July of 2020.

On August 10, 2020, Assist. Hall and Deputy Kasmar informed Plaintiff that he would be demoted from Captain to Lieutenant effective August 16, 2020. A negative performance evaluation—Plaintiff's first performance evaluation since 2008—was emailed to Plaintiff the evening of August 10, 2020, which Plaintiff signed, with objection, and returned to Assist. Hall. The re-assignment or demotion resulted in a decrease in Plaintiff's pay, and the performance evaluation remains in Plaintiff's personnel file, as a public record under Arizona law. Plaintiff attempted to challenge the performance review by filing an

allegation against Assist. Hall for allegedly false statements in the performance review, but Chief Kasmar refused to evaluate the allegations, or conduct any sort of investigation.

In September 2020, pursuant to a lawfully issued subpoena, Plaintiff testified at a hearing held September 9 through September 16, 2020, regarding [Officer A's] termination appeal to the Civil Service Commission. On September 11, 2020, Plaintiff testified consistent with his expressed opinions in the May 19, 2020 Memorandum and June 16, 2020 final report—that Officer A did *not* violate the existing TPD use of deadly force policy. On September 16, 2020, the Civil Service Commission reinstated [Officer A], and ruled, in part, that [Officer A's] actions were fully justified based on the totality of the circumstances and he acted in a reasonable manner.

On November 25, 2020, TPD amended its use of force policy to remove the "totality of the circumstances" standard. On November 26, 2020, Assistant Chief [S] ordered Plaintiff to initial the revised use of force policy "out of an abundance of caution," before a witness, Capt. [L]; no other TPD officer was required to initial the new policy.

Plaintiff asserts three constitutional violation claims under 42 U.S.C. § 1983; the first, a First Amendment Retaliation claim; the second, a due process liberty interest claim; and the third, a due process property interest claim; and seeks monetary damages and attorney's fees and costs.

Defendants move to dismiss (Doc. 13) Plaintiff's Complaint (Doc. 1-3), in its entirety, pursuant to Rule 12(b)(6), for failure to state a claim. Defendants further allege Plaintiff has stated no separate claims against Magnus, Hall, or Kasmar, in their individual capacity. Defendants move to dismiss Count I: "because the facts show that Plaintiff's speech was not

on a matter of public concern and was not as a private citizen, as such he fails to state a claim for First Amendment Retaliation"; and Counts II and III: "because Plaintiff fails to state a claim under the Due Process Clause," because of "the Chief of Police's sole discretion to terminate that assignment 'at any time without just cause or right of appeal to the Commission," and "no such claim can be established." Lastly, Defendants assert, "If Plaintiff is permitted to amend his Complaint to allege individual liability against Magnus, Hall, or Kasmar, under 42 U.S.C. § 1983, Defendants reserve their right to file another motion to dismiss" "that qualified immunity protects them from suit and civil liability." Motion to Dismiss at 2 n. 1 (Doc. 13).

## II. DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants request the Court take judicial notice of Exhibits A through I as "undisputed matters of public record" "without converting to a motion for summary judgment." (Doc. 13 at 2). "As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). There remain disputes as to the substance of the proposed exhibits, therefore, the Court excludes Defendants' Exhs. A through I, as well as, Plaintiff's Exhs. 1, 2, and 3. The Court takes judicial notice under Fed.R.Evid. 201, and *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015), of the City of Tucson Office of Professional Standards (OPS) website which provides as follows:

> [OPS] [i]s responsible for investigating complaints against department members. OPS makes findings of fact, but discipline is left to the members' chain of command to determine, up to and including the Chief of Police.

*See* www.tucsonaz.gov/police/internal-affairs .

5

### III. **_RESPONDEAT SUPERIOR_**

Defendants assert that "a municipality cannot be held liable for the actions of its employees under the theory of *respondeat superior*." Justice Brennan, writing for the Supreme Court in *Monell*, noted the following:

> [T]he language of § 1983, [ ] compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

*Monell*, 436 U.S. at 691 (italics in original).

At the motion to dismiss stage of the proceedings, the Court, declines to address any theories under *respondeat superior* as to shared, or sole, liability between the City of Tucson and the three individually named defendants, regarding any alleged constitutional torts, causation, or tortfeasors; however, notes that, "to this day, there is disagreement about the basis for imposing liability on an employer for the torts of an employee when the sole nexus between the employer and the tort is the fact of the employer-employee relationship." *Monell*, 436 U.S. at 692, 98 S. Ct. at 2036.

### IV. **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). "[A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678, 129 S.Ct. at 1949.

"When ruling on a motion to dismiss, [the Court must] construe the pleadings in the light most favorable to the nonmoving party." *Ass'n for L.A. Deputy Sheriffs v. Cnty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011). Even under the liberal pleading standard of the Federal Rules of Civil Procedure (Fed.R.Civ.P.), 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements[.]" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

## V.    42 U.S.C. § 1983

Enacted in 1871, 42 U.S.C. § 1983, creates a private right of action for damages against individuals and entities who, under color of law, violate a plaintiff's federal constitutional rights, and is set forth below, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State [ ], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [ ] for redress [. . . .]

42 U.S.C. § 1983. "[S]ection 1983 remains the exclusive remedy for federally-guaranteed rights when suit is brought against a state actor." *Roberson v. City of Goldsboro*, 564 F. Supp. 2d 526, 529 (E.D.N.C. 2008).

### A. *The Distinction Between Personal-Capacity and Official Capacity Actions*

> Where state officials are named in a complaint which seeks damages under 42 U.S.C. § 1983, it is presumed that the officials are being sued in their individual capacities. [ ]. Any other construction would be illogical where the complaint is silent as to capacity, since a claim for damages against state officials in their official capacities is plainly barred.

*Shoshone-Bannock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994).

[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right[.] More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation[.] [I]n an official-capacity suit the entity's "policy or custom" must [play] a part in the violation of federal law.

*Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985).

The Supreme Court in *Monell* explains:

Local governing bodies, therefore, can be sued directly under § 1983 [ ] where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

\* \* \*

[L]ocal governments [ ] may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision-making channels.

\* \* \*

We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted *solely* by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 690-91, 694, 98 S. Ct. at 2037–38.

      **i.**    **Defendant City of Tucson -** Regarding Defendant City of Tucson, beyond Chief Magnus, it is premature for a determination of the official-capacity suit, as to whether, collectively—Defendants Chief Magnus, Deputy Kasmar, and Assist. Hall—performed edicts and acts that represent official policy, or custom, that inflicted an injury, but for purposes of the motion to dismiss stage, the Complaint, on its face, survives the sufficiency of the claims.

      **ii.**    **Individually Named Defendants -** Regarding Defendants Magnus, Kasmar, and Hall, in addition to the official capacity action the Court must also consider personal liability for each individual, and it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.

## VI. CLAIM ONE: 42 U.S.C. § 1983 - FIRST AMENDMENT RETALIATION

**A.** *Law* – To test the sufficiency of the Complaint for a First Amendment Retaliation claim, under 42 U.S.C. § 1983, courts apply a five-step series of questions:

*Whether the Plaintiff*: (1) spoke on a matter of public concern; (2) spoke as a private citizen or public employee; (3) protected speech was a substantial or motivating factor in the adverse employment action; and *Whether the State*: (4) had an adequate justification for treating the employee differently from other members of the public; and (5) would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1057 (9th Cir. 2013).

**B.** *First Amendment Retaliation Test*

Plaintiff submits two instances of alleged protected speech for the Court's analysis:

- May 19, 2020 Memorandum; and
- Oral testimony at the Civil Service Commission hearing on September 11, 2020.

*Eng*, 552 F.3d 1062 ("First Amendment Retaliation Test").

**1.** <u>*May 19, 2020 Memorandum*</u>

*Eng* **Factor One: Matter of Public Concern (content, form, and context)**

**Content** - The content of Plaintiff's May 19, 2020 Memorandum, included "reasons that Officer [A's] use of deadly force did not violate TPD's policy." Compl. at 7, ¶ 32. As to the timing of the statement, Plaintiff raises the fact that, "[o]n **May 25, 2020**, the murder of George Floyd by the Minneapolis Police Department set off nationwide protest against police brutality, placing pressure on the COT and TPD to demonstrate that the TPD does not tolerate the use of excessive force by its officers." Compl. ¶ 33. "'Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the

community.'" *Ellins*, 710 F.3d at 1057. "A topic is a matter of public concern [ ] if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011). Although the May 19, 2020 Memorandum, at the time it was written, may not have been a topic 'of legitimate news interest' or 'of value and concern to the public at the time,' under *Jackler, supra*,—a week later—the content became a topic of discussion and debate, internally, within the TPD, as well as externally, impacting the public at large, and therefore, the inference may be drawn that the content was a matter of public concern.

**Form** – The form of Plaintiff's May 19, 2020 Memorandum is distinguishable from Plaintiff's May 5, 2020 Draft Report in that the May 5, 2020 Draft Report was solicited "[i]n April 2020, [by] assistant Chief [S] to perform an independent review of OPS's findings regarding [Officer A] and recommend the appropriate discipline." Compl. ¶ 21. The May 19, 2020 Memorandum, on the other hand, was not be requested by Chief [S], was instead addressed to [Assist. Hall], was not in the form of a draft intended for revision, was not intended for dissemination, and Plaintiff elected to write it voluntarily, and the opinions were contrary to Plaintiff's superiors and OPS.

**Context** - The context of Plaintiff's May 19, 2020 Memorandum involves a request by Chief [S] for Plaintiff to conduct what is typically a chain of command review, however, in this exceptional circumstance, because OPS had already interviewed [Officer A's] chain of command, Chief [S] requested Plaintiff conduct an independent review of [Officer A's] use of force and OPS's findings and recommendations. Plaintiff's analysis and conclusions as expressed in Plaintiff's May 5, 2020 Draft Report were contrary to OPS and contrary to Plaintiff's superiors, thus Plaintiff explained his reasoning in the May 19, 2020 Memorandum.

### Summary of *Eng* Factor One (content, form, and context)

Regarding *Eng* Factor One, based on the content, form, and context of the speech, an inference can be drawn that the May 19, 2020 Memorandum, has the potential to be a matter of public concern, however, any determination as to the scope of Plaintiff's job duties must be reserved until after the fact-finding process, discussed below. *Eng,* 552 F.3d at 1070.

### *Eng* Factor Two: Plaintiff's Speech as a Private Citizen or Public Employee

We have held that a public employee speaks as a private citizen "if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'"

> "While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law."

*Ellins*, 710 F.3d at 1058–59. "Employees in some cases may receive First Amendment protection for expressions made at work." *Garcetti v. Ceballos*, 547 U.S. 410, 420, 126 S. Ct. 1951, 1959 (2006). In the case of *Robinson v. York*, the Ninth Circuit determined, "[w]e lack jurisdiction to review the district court's finding of a genuine [ ] issue of material fact regarding whether the scope of Robinson's duties included reporting police misconduct." 566 F.3d at 824. "Instead, we assume the resolution of this dispute in the nonmoving party's favor." *Id*. "[W]hen there are genuine and material disputes as to the scope and content of the plaintiff's job responsibilities, the court must reserve judgment ... until after the fact-finding process." 566 F.3d at 823–24. However, "[if] an official duty[,] then the speech is unprotected, and qualified immunity should be granted*." Eng,* 552 F.3d at 1071.

> In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Lane v. Franks*, 573 U.S. 228, 240, 134 S. Ct. 2369, 2379 (2014).

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Garcetti*, 547 U.S. at 421–22.

11

**Summary of *Eng* Factor Two: Public Employee or Private Citizen**

Given that Plaintiff's findings and recommendations for discipline in the May 19, 2020 Memorandum—were contrary to the opinions of his superiors—there is a question of fact as to whether Plaintiff's speech in the May 19, 2020 Memorandum, was written in the course of his duties as a public employee, under *Lane*, 573 U.S. at 240 citing *Garcetti, supra.* As to the May 19, 2020 Memorandum, the Court finds any determinations as to Plaintiff's job responsibilities would be premature, although an inference may be drawn, that an expression of Plaintiff's reasoning—contrary to OPS and Plaintiff's superiors—was *not* within the scope of his job duties. The analysis regarding Plaintiff's May 19, 2020 Memorandum, therefore, ends at *Eng* Factor Two for Claim One and survives the Motion to Dismiss.

Next, the Court considers Plaintiff's Oral Testimony at the Civil Service Commission hearing on September 11, 2020, applying the 5-step First Amendment Retaliation Test.

**2. *Oral Testimony at the Civil Service Commission Hearing on September 11, 2020***

***Eng* Factor One: Matter of Public Concern (content, form, and context)**

According to the Ninth Circuit case of *Robinson v. York*, "[a]s a matter of law, 'the competency of the police force is surely a matter of great public concern.'" 566 F.3d at 822. The Ninth Circuit Court in *Robinson*, described the purpose of the Office of Professional Standards, as follows, "[w]hether OPS treats complaints of misconduct seriously or fails to follow-up is also a matter of 'relevance to the public's evaluation of the performance of governmental agencies' and consequently independently a matter of public concern." *Robinson,* 566 F.3d at 823.

**Content** - Plaintiff's oral testimony, "[a]s anticipated by Chief Magnus and the executive leadership team, [Plaintiff] testified consistently with his report and memorandum, stating that [Officer A] did not violate the existing TPD use of deadly force." Compl. ¶ 75. The content, "use of force," coincided with the timing of George Floyd's death which occurred a week after Plaintiff wrote the May 19, 2020 Memorandum, and thus potentially raised the level of awareness of the content of the memo, *i.e.*, "use of force"; as well as, the content of the oral testimony at the hearing. Thus, an inference may be drawn that Plaintiff's oral testimony at the Civil Service Commission Hearing on September 11, 2020, regarding "use of force" was a matter of 'value and concern to the public at the time' of the September 11, 2020 Civil Service Commission Hearing.

**Form** – Applicable, here, is the case of *Lane v. Franks*, wherein the United States Supreme Court distinguished speech—when testifying—uniquely, and characterized speech under oath during testimony, as speech as a private citizen, despite being a public employee, in pertinent part, as follows:

> Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. See, *e.g.,* 18 U.S.C. § 1623 (criminalizing false statements under oath in judicial proceedings) (citation omitted). When the person testifying is a public employee, he may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner. But any such obligations as an employee are distinct and independent from the obligation, *as a citizen*, to speak the truth. That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee. *Lane*, 573 U.S. at 238–39.

According to the Complaint, "[p]ursuant to a lawfully issued subpoena, on September 11, 2020, [Officer A] called [Plaintiff] to testify on his behalf." Compl. ¶ 74. The Court must accept as true, Plaintiff's allegation in the Complaint, that Plaintiff testified—"pursuant to a lawfully issued subpoena"—despite Defendants' position to the contrary. Defendants submit additional exhibits in support of the position that "[t]he evidence [ ] shows that Plaintiff was notified to appear at the hearing as a City employee and through the Memorandum the City's Human Resources Director sent to Chief Magnus." (Doc. 13 at 7). Defendants propose Exhibit E (memo), Exhibit D (Transcript), Exhibit F (photograph), however, the Court previously excluded Defendants' proposed exhibits. The Court must "construe the pleadings in the light most favorable to the nonmoving party," here, Plaintiff.

Plaintiff was called to testify at the Civil Service Commission Hearing on September 11, 2020, the form of Plaintiff's speech was testimony under oath, Plaintiff, therefore, had an obligation to tell the truth. Accordingly, under *Lane, supra,* an inference can be drawn that his speech was as a private citizen, based on the form of speech, as testimony.

**Context** –The context of Plaintiff's testimony at the Civil Service Commission Hearing on September 11, 2020, was due to [Officer A's] appeal of his termination. In considering Defendants' argument—that "[s]peech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern" under *Eng, supra*—the Court must balance this position, with the following interest, in pertinent part:

> It is well settled that the state may not abuse its position as employer to stifle "the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Acknowledging the limits on the state's ability to silence its employees, the Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*.

*Eng,* 552 F.3d at 1070. To clarify the competing interests, the court in *McKinley*, provides the following, in pertinent part:

> Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. [ ]. On the other hand, speech that concerns "issues about which information is needed or appropriate to enable the members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

*McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983).

**Summary of *Eng* Factor One (content, form, and context)**

Based on the content, form, and context of the oral testimony at the Civil Service Commission Hearing on September 11, 2020, Plaintiff's Complaint sufficiently alleges a claim that he testified to a matter of potential public concern, similar to the analysis of the May 19, 2020 Memorandum, except here, on September 11, 2020, Plaintiff testified under oath, *see Lane, supra*, as further discussed in *Eng* Factor Two, below.

**_Eng_ Factor Two:  Plaintiff's Speech as a Private Citizen or Public Employee**

According to the Complaint, Plaintiff's oral testimony was called upon when:

- "[Officer A] promptly filed a grievance claim and sought to be reinstated." (¶ 53)
- "[Officer A's] appeal of this termination required a hearing before the Civil Service Commission, which was scheduled to begin on September 9, 2020[.]" (¶ 54)
- "[Officer A] subpoenaed [Plaintiff] to testify on his behalf at the hearing." (¶ 72)
- "Pursuant to a lawfully issued subpoena, on September 11, 2020, [Officer A] called [Plaintiff] to testify on his behalf." (Doc. 1-3) (¶74)

The Court incorporates herein by this reference, the case law herein regarding *Eng* Factor Two, *see Ellins, Garcetti, supra* (speech as a private citizen when 'no official duty' shown) *Lane*, *supra* (speech as a private citizen when under oath).  The Court notes here, the City of Tucson Office of Professional Standards (OPS) (*formerly* Internal Affairs), is responsible for investigating complaints against department members and may make findings of fact, but discipline is left to the members' chain of command to determine, up to and including the Chief of Police.  *See* Judicial Notice, *supra*, p. 5.  The Civil Service Commission makes determinations on disputes between city employees and management.[2]

---

[2] The Court takes judicial notice under Fed.R.Evid. 201, *Gerritsen, supra*, of the City of Tucson website:  www.tucsonaz.gov/ward-2/news/civil-service-commisson

In the case of *Wicks v. City of Tucson*, the Arizona Supreme Court, determined the propriety of an action by the Tucson City Civil Service Commission sustaining the discharge of a city police patrolman, on the basis of a tie vote of the members of the Commission. 112 Ariz. 487, 543 P.2d 1116, 1117 (1975). The Arizona Supreme Court ruled, in pertinent part:

> In order for an employee to have the impartial hearing guaranteed him at which time just cause will be proven, the discharging officer must bear not only the responsibility of going forward with the proof, but must bear the burden of persuading a majority of the Commission members by a preponderance of the evidence to concur in his opinion. The Commission must affirmatively find the existence of just cause. The rule, being in conflict with the city charter, is void to the extent that it is contrary to the above.

*Wicks*, 112 Ariz. at 488, 543 P.2d at 1117. The Arizona Supreme Court held:

> The city charter of Tucson provides that an employee such as Wicks can only be discharged for just cause. The discharging officer furnished Wicks with a catalogue of reasons alleged to provide the police chief with just cause to discharge him. Wicks sought a hearing before the Commission which resulted in the 2—2 vote. The rules of that body then in effect provided that in the absence of a majority opinion to the contrary, the action of the discharging officer will be sustained[.] The rule is, however, contrary to the city charter.

*Id.*

### Summary of *Eng* Factor Two

The Court finds Plaintiff's allegations—regarding his oral testimony at the September 11, 2020 Civil Service Commission Hearing involving [Officer A's] termination—are sufficient to draw the inference that the content, form, and context of the speech was not limited to a personnel dispute or grievance but rather, involved disciplinary action and an appeal of termination. Plaintiff's oral testimony under oath, at the hearing, therefore, was potentially spoken as a private citizen, *Lane, supra*, under *Eng* Factor Two.

16

Next, the Court reviews the *Eng* Factor Three of the First Amendment Retaliation Test, as it is applied to Plaintiff's oral testimony at the September 11, 2020 Civil Service Commission Hearing.

***Eng* Factor Three: Substantial/Motivating Factor in the Adverse Employment Action**

In *Keyser v. Sacramento City Unified Sch. Dist.*, the Ninth Circuit listed three ways a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions. 265 F.3d 741 (9th Cir.2001). First, proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury could infer retaliation for plaintiff's speech. Second, employer expressed opposition to his speech, either to him or to others. Third, employer's proffered explanations for the adverse employment action were false and pre-textual. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

"In assessing a prior restraint, [the courts] focus on the text of the policy to determine the extent to which it implicates public employees' speech as citizens speaking on matters of public concern." *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1102 (9th Cir. 2018). Furthermore, "[b]ecause this 'ban chills potential speech *before it happens*,' as opposed to 'an adverse action taken in response to actual speech,' the government's burden is greater." *Barone*, 902 F.3d at 1105 (citation omitted) (emphasis added).

Here, Plaintiff's Complaint addresses all three ways for a plaintiff to demonstrate that retaliation was potentially a substantial or motivating factor behind adverse employment actions, as follows:

**Proximity in Time** - Plaintiff's Complaint establishes a close proximity in time, between the **May 19, 2020** Memorandum, from which Plaintiff's Complaint alleges "it was anticipated" Plaintiff would testify consistently with, at the Civil Service Commission hearing on **September 11, 2020**, and the alleged adverse employment action which occurred on **August 16, 2020**. Compl. ¶ 75.

**Opposition to Speech** – Plaintiff's Complaint sets forth numerous examples of Defendants' opposition to Plaintiff's testimony at the Civil Service Commission hearing on September 11, 2020, including but not limited to "[C]hief Magnus and/or assistant chiefs, and other TPD personnel, met with City of Tucson Attorneys regarding how to retaliate against [Plaintiff] for his anticipated testimony in [Officer A's] forthcoming hearing, and for [Plaintiff's] findings relating to the shooting. They were advised to prepare a negative performance evaluation to justify demoting [Plaintiff]." Compl. ¶ 55.

**False and Pretextual** – Plaintiff's Complaint includes the allegations that "[Assist. Hall] and Chief Magnus prepared the negative performance evaluation to create a pretext for demoting [Plaintiff] from Captain to Lieutenant [,] (Compl. ¶ 58) and "[t]he evaluation contained numerous false statements, of which [Plaintiff] immediately informed [Assist. Hall]" Compl. ¶ 61, *inter alia*.

"Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation[,]" however, there is no bright line rule. *Coszalter*, 320 F.3d at 977. "Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Coszalter*, 320 F.3d at 978.

The adverse employment actions, as alleged in the Complaint, include, but are not limited to: 1) the Performance Evaluation dated August 10, 2020 (allegedly a matter of public record); 2) a Personnel Action Request Form effective August 16, 2020, which in effect demoted Plaintiff from "Captain" to "Lieutenant"; and 3) an alleged 10% reduction in pay as a result of the demotion. Here, although the adverse employment action, on or around **August 16, 2020**, came *before* Plaintiff's testimony at the **September 11, 2020** hearing, Plaintiff alleges in the Complaint that—based on a telephonic meeting Plaintiff had with

Chief Magnus on **June 22, 2020**, *i.e.*, *before* the adverse employment action August 16, 2020, "Chief Magnus stated that in the Civil Service Commission hearing [Officer A] would request following his termination, [Plaintiff's] testimony would be [Officer A's] "Exhibit A" and his report "Exhibit B." Compl. ¶¶ 51-52.

The 90-day time frame, under *Coszalter, supra,* is sufficiently alleged in the Complaint for an inference of retaliation. Accordingly, the Court finds Plaintiff's Complaint sufficiently alleges retaliation was potentially a substantial or motivating factor behind the alleged prior restraint and adverse employment actions, under *Eng* Factor Three.[3]

The Court finds Plaintiff's Complaint sufficiently pleads a claim for 42 U.S.C. § 1983 – First Amendment Retaliation, for the Court to draw inferences and survive the Motion to Dismiss as to the May 19, 2020 Memorandum, as well as, the Oral Testimony at the Civil Service Commission Hearing on September 11, 2020, excluding Exhs A - I and Exhs. 1-3.

## VII.     CLAIM TWO:  42 U.S.C. § 1983-DUE PROCESS-LIBERTY INTEREST

### A.  Law – 42 U.S.C. § 1983 – Due Process – Liberty Interest

Section 1983 claims based upon procedural due process have three elements: 1) a liberty or property interest protected by the Constitution; 2) a deprivation of the interest by the government; and 3) lack of process. *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904

---

[3] The remaining two factors of the First Amendment Retaliation Test rest the burden with Defendants to show: (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action event absent the protected speech." *Ellins*, 71 F.3d at 1056.  Because a 12(b)(6) Motion to Dismiss tests the sufficiency of the Complaint, the Court's analysis regarding the remaining two factors of the First Amendment Retaliation Test would be premature.

(9th Cir. 1993). The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV, § 1. "The requirements of procedural due process apply [ ] where there exists a deprivation of interests encompassed by the life, liberty and property clause of the Fourteenth Amendment." *Hayes*, 893 F.2d at 237. The liberty interest protected by the due process clause "encompasses an individual's freedom to work and earn a living." *Portman*, 995 F.2d at 907.

**B. Analysis - 42 U.S.C. § 1983 – Due Process – Liberty Interest**

The Court now turns to the analysis of the elements for a due process liberty interest claim under Sec. 1983 and the sufficiency of the Complaint under *Portman*, 995 F.2d at 904.

### (1) a liberty or property interest protected by the Constitution

Defendants submit the Complaint lacks sufficient facts for a protected liberty interest requiring the City to provide due process.

Plaintiff asserts under Fed.R.Civ.P. 7(b)(1)(B), the Motion to Dismiss lacks the particularity necessary to refute Plaintiff's § 1983, due process, liberty interest claim and alleges the claims by Assist. Hall in the negative performance evaluation false, and falsely accuse Plaintiff of failing to address the community as TPD's policies require implying Plaintiff refused to uphold his oath and abide by the proper standards, thus, implicating a liberty interest because they attack the moral character and integrity of the officer.

According to the Complaint, "[Plaintiff] had a liberty interest in his continued employment and pay rate as a Captain with the TPD, and in his reputation" (Compl. ¶ 95), and "[t]he negative performance evaluation became part of [Plaintiff's] personnel file, a public record under Arizona law." Compl. ¶¶ 68, 95. Plaintiff's Complaint identifies excerpts of the negative performance review. Compl. at 11-16, ¶¶ 65(a) thru (i).

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999) (citation omitted). Under *Portman*, Plaintiff's freedom to work and earn a living was potentially impacted by the negative

20

performance review becoming a public record—coupled with the demotion and decrease in pay—the allegations are sufficient to meet the threshold requirement and draw the inference of a liberty interest protected by the Constitution potentially impacted.

**(2) a deprivation of the interest by the government**

Defendants submit "[C]hief Magnus had the sole discretion to appoint any Lieutenant to an assignment position of Deputy Chief, Assistant Chief, or Captain within the classification of Lieutenant, and to terminate that appointment 'at any time without just cause or right of appeal to the Commission[,]'" and submits Exhibits A, C, I, in support thereof.[4]

Plaintiff alleges that "[a]s a result of the demotion, [Plaintiff] suffered a pay decrease, in contradiction of TPD policy, decreased responsibility, and been deprived the opportunity to pursue his chosen career as a law enforcement officer to its highest level" Compl. ¶ 99, "[Assist. Hall] made the negative performance evaluation part of [Plaintiff's] personnel file, he knew, or should have known, it would be a public record" Compl. ¶ 102, and "Chief Kasmar's refusal to investigate the misconduct allegation" "deprived [Plaintiff] of an opportunity to clear his name" Compl. ¶ 103, "[t]he acts described above were carried about by individuals with final authority to make the determination regarding [Plaintiff's] demotion and the negative performance evaluation, including Chief Magnus and TPD's executive leadership team" Compl. ¶ 104, and "[a]s final policy makers, the City of Tucson is liable for the wrongful conduct of TPD's Chiefs and the executive leadership team because their official status cloaks them with the City's authority" Compl. ¶ 105.

In the case of *Bd. of Regents of States Colls. v. Roth*, the U.S. Sup. Ct. determined:

Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations[.] 'While '(m)any controversies have raged about [the Due Process Clause] it is fundamental [ ] due process requires that when a State seeks to terminate (a protected) interest[,] it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective.'

---

[4] As discussed herein, *supra*, the Arizona Supreme Court in *Wicks v. City of Tucson*, found that the city charter and civil service commission rules may be in conflict" accordingly, the Court declines to consider Defendants' Exhibits A, C, and I.

21

408 U.S. 564, 570 n. 7, 92 S. Ct. 2701, 2705.

The allegation of the Complaint, that "Chief Kasmar's refusal to investigate the misconduct allegation filed by [Plaintiff] regarding [Assist. Hall's] false and defamatory statements in the negative performance evaluation deprived [Plaintiff] of an opportunity to clear his name" Compl. ¶ 103, *inter alia*, sufficiently withstand scrutiny at the motion to dismiss stage for an alleged deprivation of liberty interest by the government.

### (3) lack of process.

Defendants assert "Chief Magnus had the sole discretion to appoint any Lieutenant to an assignment position" and "he had the same authority to terminate that appointment 'at any time without just cause or right of appeal to the Commission.'" (Doc. 13 at 12).

Plaintiff alleges "[t]he negative performance evaluation covers the entire two-an-a-half-year period [Plaintiff] was a Captain; during that time, [Plaintiff] was not served with a single notice of substandard performance prior to the performance evaluation, as required by TPD policy" Compl. ¶ 67, and asserts deprivation of an "opportunity to clear his name" "due to false and defamatory statements in the negative performance evaluation." Compl. ¶ 103.

The Court finds the allegations of the Complaint regarding lack of process are sufficient to withstand scrutiny at the motion to dismiss stage. The Court further finds the balancing between the nature of deprivation, *e.g.*, promotion, demotion, and or termination, and the procedural due process afforded the individual, is a fact intensive investigation inappropriate at the motion to dismiss stage. Accordingly, the Court finds Plaintiff addresses all three elements for a § 1983 – due process – liberty interest claim: 1) a protected liberty or property interest; 2) a deprivation of the interest by the government; and 3) lack of process, thus, the allegations are sufficient to survive the Motion to Dismiss.

## VIII.   CLAIM THREE 42 U.S.C. § 1983–DUE PROCESS–PROPERTY INTEREST

### A.  *Law* **42 U.S.C. § 1983** *– Due Process – Property Interest*

"Property interests are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bd. of Regents of State Colls.*, 408 U.S. at 577, 92 S. Ct. at 2709.  In *Portman*, the court determined, in pertinent part:

> A government employee has a constitutionally protected property interest in continued employment when the employee has a legitimate claim of entitlement to the job. [ ] Laws, rules or understandings derived from independent sources such as state law create such claims of entitlement. However, a mere expectation that employment will continue does not create a property interest. If under state law, employment is at-will, then the claimant has no property interest in the job.

*Portman*, 995 F.2d at 904.  In the case of *Nunez v. City of Los Angeles*, the Ninth Circuit determined "In California, the terms and conditions of public employment are generally 'fixed by the statute, rules or regulations creating it, not by contract (even if one is involved).'" 147 F.3d 867, 872 (9th Cir. 1998).  In *Nunez*, the court directed:

> To be sure, the Los Angeles City Charter grants tenured police officers 'a substantial property right' in his 'office or position'; however, it merely precludes arbitrary 'suspen[sions], demot[ions] in rank, ... remov [als],' or other separation from the LAPD. Charter of the City of Los Angeles, Art. XIX, § 202, at 323 (1990). It does not address promotions. [ ] ("The civil service rules [ ] may have created a legitimate expectation that, absent good cause, the County would not terminate Shoemaker's employment altogether or impose other disciplinary measures (e.g., demotion) that would adversely affect his compensation," but "the County retained the discretion to reassign or transfer employees without cause.").

*Nunez v. City of L.A.*, 147 F.3d 867, 872 (9th Cir. 1998). In Arizona, in the case of *Lara v. Cowan*, the District Court for the District of Arizona, found, "[i]t is state law which defines what is a property interest that is subject to the due process protections of the Fourteenth Amendment." 848 F. Supp. 1456, 1458 (D. Ariz. 1994). "A state law limiting the grounds upon which an employee may be disciplined, demoted, or discharged, such as conditioning such actions upon a finding of 'good cause,' creates a reasonable expectation of continued employment, and thus a protected property right." *Lara,* 848 F. Supp. at 1458. "On the contrary, where state employees serve at the will of the appointing authority, there is no reasonable expectation of continued employment, and thus, no property right." *Id*.

In Arizona, under A.R.S. Sec. 38-1101, in pertinent part:

**7.** "Just cause" means:
   **a)** The employer informed the law enforcement officer of the possible disciplinary action resulting from the officer's conduct through agency manuals, employee handbooks, the employer's rules and regulations or other communications to the officer or the conduct was such that the officer should have reasonably known disciplinary action could occur.
   **b)** The disciplinary action is reasonably related to the standards of conduct for a professional law enforcement officer, the mission of the agency, the orderly, efficient or safe operation of the agency or the officer's fitness for duty.
   **c)** The discipline is supported by a preponderance of evidence that the conduct occurred.
   **d)** The discipline is not excessive and is reasonably related to the seriousness of the offense and the officer's service record.

A.R.S. § 38-1101(7) (emphasis added). Additionally, under A.R.S. § 38-1103:

   **A.** A law enforcement officer is not subject to disciplinary action except for just cause.
   **B.** This section does not apply to:
      1. A dismissal or demotion that is for administrative purposes, including a reduction in force.

24

2. A law enforcement officer who is employed by an agency of this state as an at will employee.

A.R.S. § 38-1103.

### B. Analysis – 42 U.S.C. § 1983 – Due Process - Property Interest

Plaintiff's Complaint alleges "[P]laintiff's pay was reduced by over 10% with the demotion, which contradicts TPD's policy to not reduce pay when an officer if involuntarily reclassified for reasons other than disciplinary action, and, in the case of disciplinary action, not to reduce the employee's pay more than the new rank's classification." Compl. ¶ 69. Plaintiff's alleges the Personnel Action Request, "requires numerous signatures from TPD leadership and others, all of which were lacking from [Plaintiff's] form" Compl. ¶ 70.

Defendants, submit Exhibit H,[5] Plaintiff's Personnel Action Request Form ("PARF"), to support, that "on August 16, 2020, Plaintiff was removed from his assignment as Captain, which is a 'Police Lieutenant Assignment' and he was 'reassigned back to the rank of Lieutenant.' (Exhibit H, PARF). The PARF conclusively shows that Plaintiff was not demoted and the change in his assignment was not a disciplinary action." (Doc. 13 at 11).

In the case of *Shoemaker v. Cnty. of L.A.*, the court noted, "Transfers and reassignments have generally not been held to implicate a property interest." 37 Cal. App. 4th 618, 632–33, 43 Cal. Rptr. 2d 774 (1995). However, regarding compensation, the court in *Shoemaker*, indicated "[t]he civil service rules may have created a legitimate expectation that, absent good cause, the County would not terminate Shoemaker's employment altogether

---

[5] The Court declines to consider Defendants' proposed Exhibit H and excludes Exhibit H at the motion to dismiss stage for the reasons stated herein.

or impose other disciplinary measures (e.g., demotion) that would adversely affect his compensation." 37 Cal. App. 4th at 632.

Here, distinguishable from *Shoemaker, supra*, Plaintiff alleges that the demotion adversely affected Plaintiff's compensation, and "[Assist. Hall] and Chief Magnus prepared the negative performance evaluation to create a pretext for demoting [Plaintiff] from Captain to Lieutenant" (Compl. ¶ 58); and "[t]he evaluation contained numerous false statements, of which [Plaintiff] immediately informed [Assist. Hall]" (Compl. ¶ 61); and "[t]he revised evaluation still contained numerous false, inaccurate, and misleading claims and omissions, including the following: [¶¶ (a) through (i)]" (Compl. ¶ 65). Compl. at 10-11.

Given the inconsistencies between the Arizona statutes and Defendants' position that Plaintiff "was not demoted and the change in his assignment was not a disciplinary action," the Court finds, under *Shoemaker, supra*, that the allegations of Plaintiff's Complaint are sufficient to draw an inference of a protected property interest.

## IX.    CONCLUSION

### A.  Claim One – 42 U.S.C. § 1983 – First Amendment Retaliation

The Court finds Plaintiff's Claim One, based on the 1) May 19, 2020 Memorandum, and 2) oral testimony at the September 11, 2020 Civil Service Commission hearing, are sufficiently pled under 42 U.S.C. § 1983, to draw an inference of First Amendment Retaliation.

### B.  Claims Two and Three: 42 U.S.C. § 1983–Due Process – Liberty and Property Interest

The Court finds Plaintiff's Claims Two and Three are sufficiently pled under 42 U.S.C. § 1983, to draw an inference of an alleged protected liberty and property interest.

Accordingly,

IT IS ORDERED denying Defendants' Motion to Dismiss (Doc. 13) as to Claims One, Two, and Three of the Complaint.

Dated this 2nd day of February 2023.

Honorable Bruce G. Macdonald
United States Magistrate Judge