1   **WO**

2

3

4

5

6           **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8

9    Justin Lane,                                    No. CV-22-00394-TUC-BGM

10                  Plaintiff,                        **ORDER**

11   v.

12   City of Tucson, et al.,

13                  Defendants.

14

15          Before the Court is Defendants' Motion for Summary Judgment.  (Doc. 60.)  The

16   motion has been fully briefed.  (Docs. 65, 68.)  For the reasons that follow, Defendants'

17   motion is granted in part and denied in part.  Plaintiff's First Amendment retaliation claim

18   against all Defendants survives summary judgment as does Plaintiff's Fourteenth

19   Amendment property interest claim against the city of Tucson.  Plaintiff's Fourteenth

20   Amendment liberty interest claim is dismissed, and the individual Defendants are entitled

21   to qualified immunity on Plaintiff's property interest claim.

22                              **BACKGROUND**[1]

23          Plaintiff Justin Lane has been employed by the Tucson Police Department ("TPD")

24   in various law enforcement roles for over two decades.  (Doc. 61-3 at 109.)  In 2018, Lane

25   was promoted from lieutenant to captain and received a raise.  (Doc. 61, DSOF 44.[2])  As

26   part of his official duties as a captain, Lane was tasked with reviewing the findings of an

27   ───────────────

28   [1] The facts in the background section are stated in the light most favorable to Plaintiff as
    the nonmoving party.  *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002).
    [2] "DSOF" stands for Defendants' Statement of Facts.  (*See* Doc. 61 at 1-61.)

internal investigation into an officer-involved shooting and recommending discipline for several police officers.  (*Id*. DSOF 52-53.)  Lane's review and recommendation was memorialized in an official personnel report.  (*Id*. DSOF 38; Doc. 61-4 at 8.)  Prior to filing his official report, Lane submitted a draft report to TPD Chief of Police Chris Magnus. (Docs. 66, PSOF ¶ 14; 67 at 4.[3])  After sharing his draft with Chief Magnus, word of the report quickly spread among higher-ranking officers within the TPD's executive leadership team.  (*Id*. PSOF ¶¶ 15-18.)  A handful of the officers disagreed with Lane's interpretation of the department's use-of-force policy in his draft.  (*Id*.; Doc. 67 at 4.[4])  In the draft, Lane recommended that the officer who discharged his firearm in the shooting be exonerated from the charge of violating the department's use-of-force policy.  (Doc. 66, PSOF ¶ 14.) This was contrary to the investigation's recommendation and against the wishes of some executive leadership team members.  (*Id*. ¶¶ 11, 15-19, 21; Doc. 61-5 at 16-18, 99-108.)

On May 19, 2020, at the direction of one of his superiors, Lane drafted an internal memorandum, separate and distinct from his draft report, which explained Lane's position that the officer discharged his firearm consistent with department's use-of-force policy. (Docs. 66, PSOF ¶ 19; 61-2 at 113-14; 67 at 5-6.)  The superior officer requested that Lane draft the memorandum so that Chief Magnus could evaluate Lane's analysis along with the other recommendations and feedback from executive leadership team members.  (Doc. 67 at 6.)  Much to the chagrin of some leadership team members, including Lane's supervisor, Assistant Chief of Police Kevin Hall, Lane's memorandum repeated the conclusion that

---

[3] "PSOF" stands for Plaintiff's Statement of Facts.  (*See* Doc. 66 at 9-18.)

[4] This citation refers to a portion of Lane's April 4, 2022 TPD personnel report, which is appropriate supporting evidence under Federal Rule of Civil Procedure 56(c)(1)(A). Defendants argue that any of Plaintiff's Statement of Facts that rely on the report "do not create a genuine dispute of material fact." (Doc. 68 at 3.) The Court disagrees. "[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Fed. Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991) (cleaned up).  Rather, as long as the evidence "could be presented in an admissible form at trial," it may be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).  Here, the statements written in Lane's report could be presented in an admissible form at trial, e.g., Lane's direct testimony.

the officer's actions were justified and his recommendation that the officer be exonerated for his use of force in the incident. (Docs. 66, PSOF ¶¶ 19, 21; 61-2 at 112-17.)

On June 16, 2020, notwithstanding Assistant Chief Hall's opposing memorandum and admonishments from other higher-ranking officers, Lane submitted his official review and recommendation of the officer-involved shooting in a TPD personnel report. (Docs. 66, PSOF ¶ 22; 61-2 at 118-122.) While Lane agreed that discipline was appropriate for the officers involved in the shooting, including the termination of the firing officer, his report was critical of the department's lack of supervision and leadership over the incident and gang-related investigations overall. (Doc. 61-2 at 118-22.) Lane insinuated that the lack of supervision had placed the safety of the officers and the public in jeopardy. (*Id.* at 118-19, 122.) A number of executive leadership team members were rankled by the report and Lane's use-of-force analysis. (Docs. 66, PSOF ¶¶ 21, 23, 25-27; 61-3 at 1-2.[5])

On June 30, 2020, Deputy Chief of Police Chad Kasmar met with Lane at a local coffee shop. (Doc. 61-5 at 136.) During the meeting, Kasmar informed Lane that his use-of-force analysis in the shooting incident was aligned with past practices. (Doc. 61-4 at 16.) Kasmar warned Lane that he had the authority to demote commanders and that he would demote Lane if he had to. (*Id.*) Kasmar testified that he made it clear to Lane that although he was one of Lane's biggest advocates, their personal relationship would not get in the way of Lane's reassignment if the chief made that decision. (Doc. 61-5 at 139.)

On July 21, 2020, the TPD terminated the officer who had discharged his weapon in the shooting incident that Lane reviewed. (Doc. 67-4 at 2.) Sometime in July 2020, Chief Magnus notified Lane that he had not been selected for a vacant assistant chief position for which Lane had applied. (Doc. 67-2 at 5.) During this notification, Magnus

---

[5] Assistant Chief Hall was so perturbed by Lane's report that he submitted his own report on the matter. (*See* Doc. 61-3 at 1-2.) In his report, Hall states, "Captain Lane … has presented an account of the incident that inappropriately strays from a fact-based analysis into the arena of assumption and personal bias that conflates opinion with factual information. That will be addressed in another forum . . . . [Lane's] perspective is [not] congruent with the expectations of the controlling general order, the training provided by Academy staff over the past several years, or the office of the Chief of Police." (*Id.*)

informed Lane that his testimony at the upcoming civil service hearing for the terminated officer would be "Exhibit A" and his written opinion would be "Exhibit B" at the hearing. (*Id*. at 175:6-11.)  Also during this time frame, the decision was made to demote Lane from captain to lieutenant at a meeting between Magnus, Deputy Chief Kasmar, Assistant Chief Hall, and two other assistant police chiefs.  (Doc. 61-5 at 47:23-50:4, 51:23-52:3.)  One of the topics discussed at the meeting was Lane's interpretation of the department's use-of-force policy that was included in his memorandum and final report.  (*Id*. at 51:7-52:3.)

On August 13, 2020, Deputy Chief Kasmar and Assistant Chief Hall informed Lane that he was going to be "reassigned" from captain to lieutenant effective August 16, 2020. (Doc. 61, DSOF 231.)  Around that time, Hall provided Lane with a negative performance evaluation that Hall had drafted a few days earlier.  (Doc. 67 at 8, 24-29.)  The evaluation was critical of Lane's recently submitted interpretation of the department's use-of-force policy, as well as several other aspects of Lane's performance as a captain.  (*Id*. 24-29.)  In the evaluation, Hall stated that Lane "struggled with the conclusions of the investigators," and that Lane's logic was "flawed and inconsistent with policy and agency philosophy[.]" (*Id*. at 28.)  Hall also asserted that Lane's viewpoint was based on an outdated analysis and that it highlighted a disconnect between Lane and "the direction and philosophy of the department."  (*Id*.)  Hall concluded that the disconnect demonstrated that Lane had a "lack of intellectual humility that inhibits critical decision-making."  (*Id*.)

On August 16, 2020, Lane was formally demoted and his salary was reduced. (Docs. 61, DSOF 45; 61-3 at 98.)

On September 8, 2020, Lane was instructed to attend a civil service hearing later that week via a city of Tucson internal memorandum.  (Doc. 61-5 at 214.)  The hearing concerned the termination appeal of the officer who discharged his firearm in the public shooting incident.  (Doc. 67-4 at 2.)  Prior to being instructed to attend the hearing, Lane had proactively contacted the attorney representing the officer.  (Doc. 61-4 at 75:12-76:6.) Lane informed the attorney that the officer acted in compliance with the department's existing use-of-force policy and that Lane dissented in the officer's investigation. (*Id*. 70:2-

15.)  Lane also informed the attorney that the department had misapplied its policy, failed to consider the totality-of-the-circumstances standard, and misconstrued the officer's statement.  (*Id*. 73:3-17.)  Lane was instructed to attend the officer's termination appeal hearing only because he initiated contact with the officer's attorney.  (*Id*. at 75:12-76:6.)

On September 11, 2020, Lane testified on behalf of the terminated officer in front of the civil service commission.  (Doc. 67-4 at 3.)  During his testimony, Lane explained why he believed that the officer had complied with the department's use-of-force policy during the incident.  (*See* Doc. 61-3 at 15-16, 30-48, 60-65, 70-73, 78-94.)  The commission agreed with Lane's analysis and concluded that the officer had been terminated without cause.  (Doc. 67-4 at 9.)  It reinstated the officer and awarded him full backpay.  (*Id*.)

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and facts are material if they "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim … or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party carries its burden, the nonmoving party must produce evidence to support its claim or defense.  *Id*. at 1103.  If the moving party fails to carry its burden, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.  *Id*. at 1102–03.  At summary judgment, the nonmovant's evidence is to be believed and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255.  Where the record as a whole could not lead a rational trier of fact to find for the

1  nonmoving party, there is no need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio*
2  *Corp.*, 475 U.S. 574, 587 (1986).

3  **DISCUSSION**

4  This case was removed to federal court on Lane's allegations that the city of Tucson
5  and the individual Defendants violated his constitutional rights. (*See* Doc. 1-3 at 13-35.)
6  Lane contends that Defendants unlawfully retaliated against him for his First Amendment
7  protected speech and that they denied him Fourteenth Amendment procedural due process
8  liberty and property interests by using an inaccurate and defamatory performance review
9  to unlawfully demote him and tarnish his reputation. (*Id.* at 30-35.)

10  Defendants bring their summary judgment motion arguing that there are no genuine
11  disputes of material facts and that they are entitled to judgment as a matter of law. (Doc.
12  60 at 4-17.) In support of their position, Defendants assert that: (i) Lane fails to establish
13  that his speech was protected; (ii) Lane fails to establish any due process violations; (iii)
14  only Defendants Magnus and Hall can be individually liable for the alleged constitutional
15  violations; (iv) the individual Defendants are entitled to qualified immunity; and (v) Lane
16  fails to establish a *Monell* claim against the city of Tucson. (*Id.* at 4-17.) The Court
17  addresses these arguments in turn.

18  **I.    Lane's Protected Speech**

19  The United States Court of Appeals for the Ninth Circuit has developed a series of
20  sequential steps to analyze First Amendment retaliation claims brought by government
21  employees. *Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022). Those steps
22  are:

23
24  (1) whether the plaintiff spoke on a matter of public concern; (2) whether the
25  plaintiff spoke as a private citizen or public employee; (3) whether the
    plaintiff's protected speech was a substantial or motivating factor in the
    adverse employment action; (4) whether the state had an adequate
26  justification for treating the employee differently from other members of the
    general public; and (5) whether the state would have taken the adverse
27  employment action even absent the protected speech.
28

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). The plaintiff bears the burden of production on the first three steps. *Id.* at 1070-71. If the plaintiff meets his burden, the burden shifts to the defendant on the last two steps. *Id.* In the analysis at hand, only the first two steps are at issue. (*See* Doc. 60 at 4 ("[T]he inquiry should end after the second question because Lane cannot establish that his speech was protected")); *see also Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022) (observing that the protected speech inquiry is broken down to the first two steps of the retaliation analysis).

Defendants assert that they are entitled to judgment as a matter of law on Lane's First Amendment retaliation claim because Lane fails to demonstrate that he engaged in protected speech. (Doc. 60 at 4.) The Court disagrees. While Lane's memorandum and personnel report were not provided as a private citizen and are not protected, his civil service commission testimony addressed matters of public concern and was provided as a private citizen and is protected. Accordingly, Defendants' summary judgment motion on the merits of Lane's First Amendment retaliation claim is denied.

### A.    Speech Addresses Matters of Public Concern

The first step in the First Amendment retaliation analysis is determining whether the challenged speech addresses a matter of public concern. *Eng*, 552 F.3d at 1070. Whether speech addresses a matter of public concern is a question of law for the court to decide. *Greisen v. Hanken*, 925 F.3d 1097, 1109 (9th Cir. 2019). In making this determination, the content, form, and context of the challenged statements are analyzed. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Of the three factors, content is the most important. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). In reviewing a statement's form and context, the focus is on the "*point* of the speech," looking at such factors as the employee's motivation and intended audience. *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002) (cleaned up). As to the content, the speech must concern "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). The Ninth

Circuit broadly defines the public concern element as "[s]peech that can fairly be considered as relating to *any* matter of political, social, or other concern to the community[.]" *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (emphasis added); *see also Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (reiterating that the circuit has "defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace").

The speech at issue here is Lane's May 19, 2020 memorandum, June 16, 2020 personnel report, and September 11, 2020 civil service commission testimony. (Docs. 60 at 5; 65 at 5.) The statements within this speech addressed the TPD's use-of-force policy as it applied to an officer-involved public shooting. (*See* Docs. 61-2 at 113-14, 120-22; 61-3 at 9-22, 24-48.) The statements also addressed the department's alleged lack of supervision and leadership over the events leading up to the shooting and over gang-related investigations overall. (*See* Docs. 61-2 at 114, 118-19, 122; 61-3 at 71.) The speech was disseminated during a time of heightened scrutiny over police conduct and supervision, as the highly publicized George Floyd incident occurred on May 25, 2020, which resulted in months of public protests in Tucson. (Docs. 61, DSOF 94; 66, PSOF ¶ 20.)

Lane's speech in the middle of a national uproar over police violence undoubtedly addresses matters of public concern. *See City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-84 (2004) (explaining that public concern is something "that is a subject of legitimate news interest … and of value and concern to the public at the time of publication"). That the speech encapsulated Lane's view that the officer's use of force was within policy is irrelevant to the analysis. *See Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (instructing that the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern"). The speech can also fairly be considered to address officer preparedness in responding to crime, which is also constitutionally protected. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) ("[A]n opinion about the preparedness of a vital public-safety institution … goes to the core of what constitutes speech on matters of public

1   concern").  As such, the challenged speech addressed matters of public concern.

2   **1. Counterarguments Unpersuasive**

3   In addition to determining that Lane's speech addressed matters of public concern,

4   the Court finds Defendants' arguments to the contrary unpersuasive.  Defendants assert

5   that Lane's speech failed to address matters of public concern because Lane was instructed

6   to draft his memorandum and report as part of his official duties; the written materials were

7   addressed to Lane's chain of command; Lane was instructed to attend the commission

8   hearing via a City memorandum; and Lane testified in front of the civil service commission

9   while on duty and was paid for his time.  (Doc. 60 at 6-7.)  Defendants add that Lane's

10  speech did not address any alleged injustice, illegality, or wrongdoing, and assert that he

11  was not advocating for any change in the TPD's use-of-force policy.  (*Id*. at 7.)

12  To begin, Defendants' assertion that Lane's speech did not address any alleged

13  injustice, illegality, or wrongdoing is inaccurate.  Lane proactively testified on behalf of a

14  terminated police officer over whom the TPD had conducted a faulty investigation.  (Doc.

15  66, PSOF ¶ 50.)  It was Lane's opinion that the department misapplied its use-of-force

16  policy, failed to consider the totality of circumstances standard, misconstrued the officer's

17  statement, and wrongfully terminated the officer when he had actually acted within the

18  department's guidance.  (Docs. 61-3 at 13:22-25, 14:25-15:22; 61-4 at 73:3-19.)  The fact

19  that the commission ruled that the officer's use of force was within policy and that he was

20  terminated without cause reinforced Lane's position.  (*See* Doc. 67-4 at 9.)

21  Defendants also overlook the Ninth Circuit's broad definition of the public concern

22  element and disregard its warning that "[i]t is only when it is clear that the information

23  would be of *no* relevance to the public's evaluation of the performance of governmental

24  agencies that speech of government employees receives no protection under the First

25  Amendment."  *Ulrich*, 308 F.3d at 978 (cleaned up).  Defendants also ignore the court's

26  repeated instruction that a plaintiff's private rather than public expression of his views "is

27  not determinative of whether [his] expression is entitled to protection."  *Thomas v. City of*

28  *Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004); *see also Robinson v. York*, 566 F.3d 817,

823 (9th Cir. 2009) (cleaned up) (observing that "[r]eports pertaining to others … can still be protected under the public concern test").  Moreover, Lane's public safety commentary has been held to be of "vital interest to citizens in evaluating the performance of their government," *Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992), and the competency of the police force has been recognized as "a matter of great public concern," *McKinley*, 705 F.2d at 1114.

Finally, the Ninth Circuit has instructed that a public employee's testimony addresses a matter of public concern "if it contributes in some way to the resolution of a[n] … administrative proceeding in which … significant government misconduct is at issue—even if the speech itself would not otherwise meet the *Connick* test were [the court] to consider it in isolation." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 927 (9th Cir. 2004).  As such, Defendants counterarguments are denied.

### B.     Testimony Provided as Private Citizen

The second step in the First Amendment retaliation analysis is to determine whether Lane spoke in his capacity as a private citizen or pursuant to his official job duties when making the challenged speech.  *Karl*, 678 F.3d at 1071.  The First Amendment does not protect an employee's speech when the employee's statements are made pursuant to his official duties.  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Whether an employee's speech is pursuant to his official duties is a mixed question of fact and law.  *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008).  The "scope and content of a plaintiff's job responsibilities is a question of fact[,]" while the "ultimate constitutional significance of the facts as found" is a question of law.  *Id.* at 1129-30.  The plaintiff bears the burden of showing that his speech was spoken in the capacity of a private citizen and not a public employee.  *Eng*, 552 F.3d at 1071.

Determining the scope of Lane's official duties "is a practical one."  *Garcetti*, 547 U.S. at 424.  Formal job descriptions often bear limited resemblance to the employee's actual duties and listing a given task in an employee's job description is not sufficient to demonstrate the task is within the scope of the employee's official duties.  *Id.* at 424-25.

Due to the fact-intensive nature for determining the scope of an employee's duties, the Ninth Circuit has promulgated a few guiding principles to assist courts with the determination. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1073-74 (9th Cir. 2013).

First, in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant factor. *Id*. at 1074. "When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his [official] duties." *Id*. Second, the subject matter of the communication is highly relevant to the determination whether the speech is protected. *Id*. at 1074-75. "When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties." *Id*. at 1075. Third, "when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties." *Id*. "[T]he fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a 'practical' matter, within the employee's job duties." *Id*.

The parties disagree whether Lane spoke as a public employee or private citizen when drafting his memorandum and report and when testifying in front of the civil service commission. (Docs. 60 at 7-8; 65 at 5-7.) Defendants assert that Lane's statements owe their existence to the TPD's policies and procedures that require a supervisor to review internal investigations and recommend discipline where appropriate. (Doc. 60 at 8.) Defendants add that based on Lane's own admissions, it is an undisputed fact that his speech was performed in his official capacity. (*Id*.) Lane asserts that he drafted his memorandum and report as a private citizen because his written statements contravened his superiors' instructions to find that that the firing officer violated the department's use-of-force policy. (Doc. 65 at 5.) He also asserts that his testimony was given as a private citizen because he proactively contacted the terminated officer's attorney to offer supporting information; testifying on behalf of a terminated officer and against the

department's interest was not part of his official duties; and Defendants' arguments to the contrary are insufficient as a matter of law to prove otherwise. (*Id*. at 5-7.) The Court analyzes each instance of Lane's challenged speech to determine whether he spoke pursuant to his official duties or as a private citizen when making the statements.

### 1. Memorandum and Report Drafted Pursuant to Official Duties

It is undisputed that Lane was directed to review an internal investigation into an officer-involved shooting as part of his official duties as a captain. (*See* Docs. 61, DSOF 32; 61-4 at 7-8; 66, PSOF ¶¶ 9-10.) It is also undisputed that due to a discrepancy between the internal investigation's findings and Lane's findings, Lane was instructed to draft a memorandum to his supervisor summarizing the reasons why he disagreed with the investigation's findings. (Docs. 66, PSOF ¶ 19; 67 at 5-6; 68 at 2.) And despite Lane's independent findings, he concurred with his chain of command's recommendation that the officer responsible for discharging his firearm should be terminated in his personnel report. (Docs. 66, PSOF ¶ 13; 68 at 2.) Even believing his evidence and drawing all justifiable inferences in his favor, the Court concludes that Lane acted pursuant to his official duties when he drafted and submitted his memorandum and report.

In *Garcetti v. Ceballos*, a deputy district attorney conveyed concerns regarding the accuracy of an affidavit in support of a search warrant in a memorandum to his supervisors. 547 U.S. 410, 414 (2006). The memo explained the attorney's concerns and recommended case dismissal. *Id*. Based on the attorney's statements, a meeting was convened to discuss the affidavit with employees of the local sheriff's department including the affiant. *Id*. The meeting became contentious when a sheriff's lieutenant criticized the attorney's handling of the case. *Id*. Despite the attorney's concerns, one of his supervisors decided to proceed with the prosecution. *Id*. At a suppression hearing, the attorney was called by the defense and testified as to his observations about the affidavit. *Id*. at 414-15. The trial court rejected the challenge to the warrant and the attorney was reassigned to a different position, transferred to another courthouse, and denied a promotion. *Id*. at 415.

In ruling that the expressions in the attorney's memorandum were made pursuant to his official duties, the Supreme Court observed that the attorney drafted the memo because "that is part of what he, as a calendar deputy, was employed to do." *Id*. at 421. The Court opined that it was irrelevant whether the attorney experienced gratification from drafting the memo and instructed that restricting speech that owes its existence to a public employee's professional responsibilities does not infringe on the employee's liberties as a private citizen. *Id*. at 421-22. The Court determined that the attorney's supervisors were not prohibited from evaluating his performance simply because the attorney's duties sometimes required him to write. *Id*. at 422. The Court concluded that refusing to recognize First Amendment claims based on an employee's work product does not prevent the employee from participating in public debate. *Id*.

This Court sees little factual distinction between the *Garcetti* memo and the memo and report written in the case at hand. Here, at the direction of his superiors, a former police captain drafted his review of an internal investigation into an officer-involved use-of-force incident and arrived at a different conclusion. (Docs. 61-2 at 118-122; 66, PSOF ¶¶ 9-13.) Before he filed his official report, the captain was asked to explain his analysis in a memorandum to his supervisor. (Docs. 61-2 at 112-114; 66, PSOF ¶ 19; 67 at 5-6.) The memo and report concerned a subject matter that the captain had previously addressed and the assignment was given to him due to a conflict of interest in the disciplined officer's chain of command. (Docs. 61-3 at 9; 66, PSOF ¶ 10.) The memo and report were made pursuant to a captain's official duties, as was participation in internal conversations and debate surrounding his analysis. (Doc. 66, PSOF ¶¶ 9-11, 16, 18-19.) As such, the statements in the memo and report were made by Lane pursuant to his official duties as a captain and the speech is unprotected.[6]

---

[6] The fact that some of the statements in Lane's memo and report were in contravention to the wishes of his chain of command, alone, does not convert the statements into protected speech. *See Ohlson v. Brady*, 9 F.4th 1156, 1166 (9th Cir. 2021) (ruling that "*Dahlia* does not stand for the proposition that speech in defiance of orders is always a strong indication that an employee is speaking as a private citizen and the speech protected").

## 2.  Commission Testimony Provided as Private Citizen

While the statements in Lane's memorandum and report were made pursuant to his official duties as a captain, his testimony in front of the civil service commission was not. There is sufficient evidence in the record that demonstrates that Lane was not testifying pursuant to his official duties when he appeared before the civil service commission on behalf of a terminated police officer.  Lane's day-to-day captain duties included reviewing internal investigations into alleged incidents of officer misconduct and leading a division within the police force, but there is no evidence to suggest that they also included testifying on behalf of a terminated officer at his appeal hearing.  The fact that the testimony was provided to an entity outside of Lane's chain of command and was given against the explicit admonition of Chief Magnus also indicates that the testimony was given in a private rather than public capacity.

In *Lane v. Franks*, the Supreme Court ruled that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes."  573 U.S. 228, 238 (2014).  The plaintiff in *Lane* was a program director for a state community college.  *Id*. at 231-32.  As the director, the plaintiff was responsible for the program's day-to-day operations and finances.  *Id*. at 232.  Upon auditing the program's expenses, the director learned that a state representative was on the program's payroll but was not working.  *Id*.  The director informed the college's president and was warned that firing the representative could have negative repercussions for him and the college.  *Id*.  The director fired the representative, which prompted an FBI investigation.  *Id*.  The director then twice testified at the representative's criminal trials concerning the events that led to her termination.  *Id*. at 233.  The director was ultimately terminated by a new college president, which caused the director to bring suit against the president for First Amendment retaliation.  *Id*. at 234.

In reversing the district court's summary judgment ruling in the president's favor, the Court observed that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes ….

even when the testimony relates to his public employment or concerns information learned during that employment." *Id.* at 238. The Court explained that sworn testimony in a judicial proceeding is a "quintessential example of speech as a citizen" because "[a]nyone who testifies in court bears an obligation, to the court and society at large, to tell the truth." *Id*. The Court ruled that any separate obligation as an employee, such as showing up to court dressed in a professional manner, is separate from the obligation to speak the truth and that such obligation renders sworn testimony speech as a private citizen. *Id*. at 239.

In the context of *Lane* and under the guiding principles promulgated by *Dahlia v. Rodriguez*, 735 F.3d 1060, 1072-73 (9th Cir. 2013), this Court concludes that Lane's civil service commission testimony was provided in his capacity as a private citizen and is protected. It is an undisputed fact that the civil service commission hearing at which Lane testified concerned a termination appeal by the officer that Lane described in his memo and report as comporting with the department's use-of-force policy. (Docs. 61, DSOF 63; 66 at 3.) It is also an undisputed fact that *the officer* requested that Lane be subpoenaed to testify at the hearing, which then prompted the City to issue its memorandum to Lane. (Docs. 66, PSOF ¶¶ 28-30, 50; 68 at 2.) It is irrelevant to the Court's analysis whether Lane's testimony "relate[d] to his public employment or concern[ed] information learned during that employment." 573 U.S. at 238. Rather, the critical question is whether Lane's testimony "is itself ordinarily within the scope of [the] employee's duties, not whether it merely concerns those duties." *Id*. at 240.

The fact that Lane affirmed defense counsel's leading deposition question that he appeared before the civil service commission in his "capacity as a TPD lieutenant for the police department" fails to adequately support Defendants' proposition that Lane testified in his official capacity as a matter of law. *See Garnett v. ADT LLC*, 139 F. Supp. 3d 1121, 1125 (E.D. Cal. 2015) (ruling that statements based on improper legal conclusions are not *facts* and can only be considered as arguments on a motion for summary judgment). Additionally, while Defendants proffer a TPD general order concerning court attendance and interviews, the order fails to demonstrate that department employees must *testify* at

civil service commission hearings or show that commission attendance and testimony are part of a captain's official duties. (*See* Doc. 61-2 at 81 ("*Attendance* at such a hearing is mandatory for any employee who is duly notified.") (emphasis added)); *Garcetti*, 547 U.S. at 425 ("[T]he listing of a given task in an employee's written job description is … no[t] sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes").

Finally, the transcript of Lane's civil service commission testimony spans over ninety pages and includes references to Lane's position that the terminated officer's use of force was justified and within department policy, his responses to hypothetical use-of-force scenarios, and Lane's controversial opinion that the officers in the incident were not afforded the necessary guidance, leadership, and tools to be expected to accomplish their mission. (*See* Doc. 61-3 at 13-48, 50-57, 71-72, 78-94.) This testimony goes well beyond Lane's "opinion that the officer did not violate the policy" and "should not be disciplined." (Doc. 60 at 7.) As such, Lane's civil service commission testimony was provided as a private citizen, and Defendants' summary judgment motion on the issue is denied.

## II.    Protected Property Interest in Continued Employment[7]

"The Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). A procedural due process claim under section 1983 has two elements: (i) "a deprivation of a constitutionally protected liberty or property interest," and (ii) "a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). As it concerns Lane's property interest claim, only the first element is contested by Defendants. (*See* Doc. 60 at 9-11.)

A government employee has a constitutionally protected property interest in continued employment when he has a reasonable expectation or a legitimate claim of entitlement to it. *Brady v. Gebbie*, 859 F.2d 1543, 1547-48 (9th Cir. 1988). "A state law

---

[7] The Court addresses Defendants' summary judgment due process arguments in separate sections according to Lane's alleged property and liberty interests.

limiting the grounds upon which an employee may be disciplined, demoted, or discharged, such as conditioning such actions upon a finding of 'good cause,' creates a reasonable expectation of continued employment, and thus a protected property right." *Lara v. Cowan*, 848 F. Supp. 1456, 1458 (D. Ariz. 1994) (citing *Brady*, 859 F.2d at 1548). "Where state employees serve at the will of the appointing authority, however, there is no such reasonable expectation of continued employment, and thus no property right." *Brady*, 859 F.2d at 1548.

Defendants argue that Lane's property interest claim fails as a matter of law because the captain "assignment" is not a civil service protected position. (Doc. 60 at 10.) Defendants assert that the city's charter and civil service rules are not triggered when the chief of police "reassign[s]" an officer serving in the captain position because the captain "assignment" is not a protected position. (*Id*. at 10.) Defendants suggest that Lane is an at-will employee because of a department general order which provides that the "[c]hief of [p]olice may make appointments to non-[c]ivil [s]ervice grade positions (e.g., [p]olice [l]ieutenant assigned as [c]aptain) at his/her discretion." (*Id*. at 10.)

Lane argues that the record establishes that he has a reasonable expectation of continued employment in his police captain position. (Doc. 65 at 8.) Lane invokes Arizona law, Ariz. Rev. Stat. §§ 38-1101-1120, and asserts that his demotion serves as "disciplinary action" under the statute, *id*. at § 1101(3). Under Arizona law, a law enforcement officer can only be subject to disciplinary action for just cause. Ariz. Rev. Stat. § 38-1103(A). Lane argues that it is undisputed that he was "demoted" under the ordinary meaning of the term and that just cause was required for his demotion under state statute. (Doc. 65 at 9.) Lane concludes that even if the state statute did not apply to his demotion, Defendants could not demote him for bad cause in violation of the law. (*Id*. at 10.)

### A. Lane Demonstrates Genuine Issue of Material Fact

Here, there is sufficient evidence in the record to create a genuine issue of material fact as to whether Lane was deprived of a protected property interest in his police captain position. The record indicates that on August 16, 2020, Lane was demoted from captain

to lieutenant for what can reasonably be inferred to as unsatisfactory performance. (*See, e.g.*, Docs. 61-5 at 7-12, 16-18, 67 at 24-30.) To effectuate the demotion, Lane's grade was lowered from 321 to 320 and his salary was reduced from $56.45 to $50.63 per hour, a wage differential greater than ten per cent. (Doc. 61-3 at 98.) Additionally, there is sufficient evidence in the record for a reasonable jury to conclude that Lane was demoted without just cause in contravention of the relevant Arizona statute, and Defendants fail to challenge the second element of Lane's property interest claim. (*See* Doc. 60 at 9-11.)

In addition to the existence of a genuine issue of material fact on the first element of a property interest claim, Defendants fail to provide convincing legal arguments to demonstrate that Lane was an at-will employee. Despite Defendants' assertions to the contrary, none of the exceptions to classified service found in the city's charter or code are applicable to TPD police captains. *See* Tucson City Charter, ch. 22, § 3(a); Tucson Code §§ 10-4(1)-(2). To the extent that language in the department's general order conflicts with the city charter or state law, the general order lacks the force and effect of controlling law. *See Civ. Serv. Comm'n of City of Tucson v. Foley*, 257 P.2d 384, 387 (Ariz. 1953). Under Tucson's charter, Lane was entitled to a civil service commission hearing regardless of whether he was "reassigned" or demoted because he suffered a reduction in pay and position. *See* Tucson City Charter, ch. 22, § 3(c) ("Persons who have served through their probationary period and who have received permanent appointment in the classified service shall not be removed, suspended without pay, discharged, or reduced in pay or position, except for just cause"); *City of Tucson v. Simpson*, 323 P.2d 689, 692 (Ariz. 1958) ("The rules and regulations adopted by the Civil Service Commission pursuant to the mandate of the city charter provide for an appeal to the Commission by a permanent employee who has been suspended, demoted, or reduced in pay or position."). Accordingly, Defendants' summary judgment motion on Lane's property interest claim is denied.

## III.    Failure to Establish Liberty Interest Claim

The liberty interest protected by the due process clause encompasses a public employee's freedom to work and earn a living. *Portman*, 995 F.2d at 907. "An individual

has a liberty interest in employment protected by the Due Process Clause if the personnel action is for reasons that might seriously damage his standing in the community, or if it effectively precludes future work in the individual's chosen profession." *Stiesberg v. State of Cal.*, 80 F.3d 353, 357 (9th Cir. 1996) (cleaned up).

To establish a due process liberty interest claim for loss of reputation, a government employee must demonstrate: (i) the public disclosure of a stigmatizing statement by the government; (ii) the accuracy of which is contested; *plus* (iii) the alteration of a right or status recognized by state law. *Ulrich*, 308 F.3d at 982. "If an employee makes these showings, and was not provided a 'name-clearing' hearing, the employee has been denied due process under the Fourteenth Amendment." *Perez v. City of Roseville*, 926 F.3d 511, 523 (9th Cir. 2019) (cleaned up).

Defendants argue that they are entitled to judgment as a matter of law on Lane's liberty interest claim because he fails to demonstrate that the statements in his performance evaluation impacted his ability to get employment elsewhere and his future with the TPD. (Doc. 60 at 13.) Defendants add that there is no evidence showing that the evaluation was provided to a prospective employer and that no one made a request for Lane's personnel file. (*Id.*) Defendants also argue that Lane had an opportunity to submit a rebuttal to his performance evaluation, but that he chose not submit anything until April 2022 (*Id.*)

Lane argues that it is irrelevant whether anyone requested or viewed his evaluation because placement of the evaluation in his file, in the face of a state statute mandating release upon request, constitutes publication of the information under law. (Doc. 65 at 12.) Lane asserts that the evaluation is stigmatizing because it "essentially" accuses him of violating the department's code of conduct. (*Id.*) Lane includes Hall's comment that he "seemingly does not or cannot recognize the worth of ideas or concepts that conflict with his own" as an example of a code of conduct violation accusation. (*Id.*) Lane adds that other evaluation statements accuse him of failing to engage with the community and such accusations could seriously damage his standing in the community. (*Id.* at 13.)

The Court concludes that Lane fails to produce sufficient evidence to establish a

genuine issue of material fact on the first element of a due process liberty interest claim. He fails to proffer evidence demonstrating that Arizona law classifies his personnel file, and the performance evaluation located therein, as a public record subject to release upon request; and he fails to offer evidence demonstrating that the statements in his performance evaluation impair his reputation for honesty or morality or rise to the level of stigmatization required to preclude all future employment in his chosen profession. As such, Defendants' summary judgment motion on this claim is granted, and the claim is dismissed.

### A.    Lack of Evidence Demonstrating Public Disclosure

For an employee's liberty interest to be implicated, stigmatizing statements must be published. *Portman*, 995 F.2d at 907; *see also Learned v. Bellevue*, 860 F.2d 928, 933 (9th Cir. 1988) (observing that defamatory remarks that do not go beyond others employed by department do not satisfy publication requirement). In *Cox v. Roskelley*, stigmatizing information about a Washington State employee was placed in the employee's personnel file. 359 F.3d 1105 (9th Cir. 2004). The court held that "absent expungement, placement of stigmatizing information in an employee's personnel file constitutes publication when *the governing state law classifies [the] personnel file as a public record*." *Id*. at 1112 (emphasis added). Washington law classified the employee's personnel file as a public record and mandated disclosure upon request of all materials contained in the file. *Id*. at 1112-13. As such, based on Washington law, placement of stigmatizing information in the employee's file constituted publication sufficient to trigger constitutional protection. *Id*.

Here, Defendants assert that there is no evidence showing that Lane's performance evaluation was provided to the outside police department to which Lane applied and that no one has made a request for his personnel file. (Doc. 60 at 13.) Lane responds by asserting that it is irrelevant whether anyone actually requested or viewed his evaluation because placement of the evaluation in his personnel file, "in the face of a state statute mandating release upon request," constitutes publication sufficient to trigger a protected liberty interest. (Doc. 65 at 12.) Lane provides no further details and fails to reference Arizona law or cite to evidence in the record that supports his claim. (*See id*.)

1   In the face of a valid evidence-based challenge by Defendants, the Court cannot

2   credit Lane's conclusory response.[8]   Additionally, there is no credible evidence in the

3   record suggesting that there was public disclosure of Lane's performance evaluation by

4   Defendants.  *See Bishop v. Wood*, 426 U.S. 341, 348 (1976) (ruling that where the reasons

5   for a municipal police officer's discharge were not made public, there was no basis for a

6   reputational liberty interest claim).   Lane testified that he submitted an employment

7   application with another police department and that the application was denied.  (Doc. 61-

8   4 at 19-22.)  But Lane only speculates that it was publication of his performance evaluation

9   that prevented him from going further in the application process.  (*Id*. at 27-30.)   At

10  summary judgment, speculative testimony is insufficient to create a genuine issue of

11  material fact on a necessary element of a claim.  *See Thornhill Publ'g Co. v. GTE Corp.*,

12  594 F.2d 730, 738 (9th Cir. 1979) (instructing that conclusory testimony is insufficient to

13  raise genuine issues of fact and defeat summary judgment).  As such, Lane fails to produce

14  sufficient evidence that the alleged stigmatizing statements in his performance evaluation

15  were publicly disclosed, and his claim is dismissed.

16      **B.    Statements Fail to Infringe Protected Interest**

17      In addition to finding that Lane failed to produce evidence demonstrating public

18  disclosure of his performance evaluation, the Court also finds that Lane fails to produce

19  evidence which demonstrates that the statements in his evaluation rise to the level of

20  stigmatization required to preclude all future employment in his chosen profession or

21  impair his reputation for honesty or morality.  As such, the statements fail to infringe a

22  protected liberty interest and the claim fails.

23

24  [8] *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely
    disputed must support the assertion by citing to particular parts of materials in the record,
25  including depositions, documents, electronically stored information, affidavits or
    declarations, stipulations (including those made for purposes of the motion only),
26  admissions, interrogatory answers, or other materials"); *Rivera v. Nat'l R.R. Passenger
    Corp.*, 331 F.3d 1074, 1078 (9th Cir.) ("Conclusory allegations unsupported by factual data
27  cannot defeat summary judgment.").

28

A statement is sufficiently stigmatizing if the government discloses the employee's dismissal was for "reasons that might seriously damage his standing in the community," or if the dismissal "effectively precludes future work in the individual's chosen profession." *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir. 1987). "Charges that carry the stigma of moral turpitude such as dishonesty or immorality may implicate a liberty interest, but charges of incompetence or inability to get along with others do not." *Portman*, 995 F.2d at 907. Moreover, charges of substandard performance may not rise to the level necessary to infringe a protected liberty interest. *Debose v. U.S. Dep't of Agric.*, 700 F.2d 1262, 1266 (9th Cir. 1983). Where a plaintiff fails to present evidence that he is actually precluded from future employment in his chosen profession, summary judgment is appropriate. *See Merritt*, 827 F.2d at 1373; *Bollow v. Fed. Rsrv. Bank of San Francisco*, 650 F.2d 1093, 1101 (9th Cir. 1981).

In the situation at hand, there is no evidence in the record that demonstrates the statements in Lane's performance evaluation rise to the level of stigmatization required to infringe upon a protected liberty interest. While the statements are pointed and specific, they focus on Lane's alleged inability to satisfactorily perform his duties as a police captain and to get along with others within the department. (*See, e.g.,* Doc. 67 at 34 (criticizing Lane's lack of supervision over a code enforcement project); *id.* at 33 (citing apparent interpersonal issues between Lane and a TPD lieutenant).) The statements also challenge Lane's intellectual humility, ability to take constructive criticism, and willingness to consider the opinions of higher-ranking officers. (*See, e.g.,* Doc. 67 at 32 ("Lane's willingness to change or be open to other opinions or ideas that conflict with his own was not at a level that I expected for a senior-level leadership position"); *id.* at 33 ("This lack of intellectual humility is concerning as I find this characteristic to be a core component of any effective leadership style").)

Furthermore, Lane fails to reference any statements that could be seen to impair his reputation for honesty or morality, (*see* Doc. 65 at 11-14); and there is no evidence in the record demonstrating that the statements in Lane's evaluation prevented him from being

1    employed in a law enforcement profession or serving as a higher ranking officer in his own

2    municipal police department.  To the contrary, the record demonstrates that Lane remains

3    employed as a lieutenant with the TPD and that he has earned accolades in his current role.

4    (*See* Doc. 61-3 at 109-11.)  As such, there is no infringement of Lane's reputational liberty

5    interest, and Defendants' summary judgment motion on the claim is granted.

6    **IV.    Qualified Immunity Shields Officials From Property Interest Claim** [9]

7         "[Q]ualified immunity protects government officials from liability for civil damages

8    insofar as their conduct does not violate clearly established statutory or constitutional rights

9    of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223,

10   231 (2009) (cleaned up).  Whether a government official is entitled to qualified immunity

11   at summary judgment involves two questions: (i) whether the facts, viewed in the light

12   most favorable to the plaintiff, demonstrate that the official violated a constitutional right;

13   and (ii) whether the right was clearly established at the time of the alleged violation.  *Tolan*

14   *v. Cotton*, 572 U.S. 650, 655-56 (2014).  "Either question may be addressed first, and if the

15   answer to either is "no," then the [official] cannot be held liable for damages."  *Gordon v.*

16   *Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021).

17        **A.    Clearly Established Prong**

18        Defendants challenge the clearly established prong of the qualified immunity

19   analysis in their summary judgment motion.  (*See* Doc. 60 at 14-15.)  Defendants assert

20   that they had no way of knowing that Lane's speech would be protected under the facts of

21   this case and that his "reassignment" was done in compliance with TPD general orders and

22   civil service rules and regulations.  (*Id*. at 15.)  Lane argues that Chief Magnus was aware

23   that his demotion was unlawful when Magnus informed the press that he could not

24   discipline Lane based on the content of his testimony because it could appear retaliatory.

25

26   [9] Defendants failed to raise the affirmative defense of qualified immunity in their answer.
     (*See* Doc. 21 at 9-11.)  However, since Plaintiff fails to demonstrate prejudice, the qualified
27   immunity defense has not been waived.  *See Camarillo v. McCarthy*, 998 F.2d 638, 639
     (9th Cir. 1993) ("In the absence of a showing of prejudice, … an affirmative defense may
28   be raised for the first time at summary judgment").

(Doc. 65 at 15.)  Lane adds that the impropriety of the city's actions was deemed beyond debate in *Lane v. Franks*, 573 U.S. at 246, and that the Ninth Circuit's ruling in *Brady v. Gebbie*, 859 F.2d 1543, 1553 (9th Cir. 1988), established precedent concerning his due process liberty interest claim.   (*Id.*)

Whether a constitutional right is clearly established is purely a question of law for the court to decide.  *Gordon*, 6 F.4th at 968.  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).  "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."  *Id*. at 63 (cleaned up).  It is not enough that the rule is suggested by then-existing precedent.  *Id*.  "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Id*.  "Reasonableness is judged against the backdrop of the law at the time of the conduct, and a case directly on point is not required, but existing precedent must have placed the statutory or constitutional question beyond debate."  *DePaul Indus. v. Miller*, 14 F.4th 1021, 1026-27 (9th Cir. 2021) (cleaned up).  It is the plaintiff's burden to prove that the right violated was clearly established at the time of the alleged misconduct.  *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

### 1.    First Amendment Right Clearly Established

To determine if a right was clearly established, "[t]he relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional."  *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013), *abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019).  At the time of Lane's demotion in August 2020, the law in this circuit gave fair notice that it would be unlawful for a government employer to retaliate against an employee on account of testimony the employee gave under oath and outside the scope of his ordinary job duties.

In *Lane v. Franks*, the Supreme Court held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes."  573 U.S. 228, 238 (2014).  The Court added that the speech

- 24 -

is protected even when the testimony relates to the employee's public employment or concerns information learned during that employment.  *Id.*

In *Ellins v. City of Sierra Madre*, the Ninth Circuit reversed the district court's qualified immunity ruling in favor of the defendant chief of police, instructing that the court had framed the inquiry "much too narrowly."  710 F.3d 1049, 1064 (9th Cir. 2013).  In *Ellins*, the plaintiff police officer brought a section 1983 First Amendment retaliation claim against the city and its police chief related to the chief's delay in certifying the officer for a pay increase due to the officer's role in no-confidence vote against the chief.  *Id.* at 1054-55.  The court ruled that the plaintiff's "First Amendment right to be free from retaliation for engaging in protected speech was clearly established in 2009."  *Id.* at 1065.  The court instructed that since 1968, "the Supreme Court established that public employees have a First Amendment right to be free from retaliation for commenting on matters of public concern, even when the protected comments are critical of their employers."  *Id.*  The court concluded its qualified immunity analysis by also observing that as of 2009, it was clearly established that a "deprivation of an employee's salary is unconstitutional if levied in retaliation for protected speech."  *Id.*

In *Karl v. City of Mountlake Terrace*, the Ninth Circuit declared that it was "clearly established [in 2008] that a subordinate officer can be liable under § 1983 for retaliating against an employee even if he also has legitimate, non-retaliatory motives."  678 F.3d 1062, 1075 (9th Cir. 2012).  The court also observed that "it was clearly established since at least 2007 that testifying pursuant to a subpoena in a judicial or administrative proceeding of public concern constitutes protected speech."  *Id.* at 1074.

In *Clairmont v. Sound Mental Health*, the Ninth Circuit ruled that it was clearly established that "it would be unlawful to retaliate against an employee for having testified in a criminal proceeding pursuant to a subpoena."  632 F.3d 1091, 1109 (9th Cir. 2011).

These cases illustrate that the Supreme Court and the Ninth Circuit have recognized constitutional protection for public employees who speak as private citizens on matters of public concern and have denied qualified immunity to officials who retaliate against them.

1  Accordingly, Defendants' summary judgment motion on the issue of qualified immunity

2  in the First Amendment context is denied.

3                **2.**       **Protected Property Right Not Clearly Established**

4        While the Court concludes that Lane's First Amendment right to engage in protected

5  speech without retaliation was clearly established by August 2020, the same cannot be said

6  about his protected property interest in continued employment under Arizona law.   Lane

7  alleges and reasserts that the Arizona Peace Officers' Bill of Rights, Ariz. Rev. Stat. §§ 38-

8  1101-1120, provides him with a protected property interest in his municipal police captain

9  position.  (Docs. 1-3 at 34-35; 65 at 8-9.)  But the Arizona statute, passed in 2014 and

10  amended in 2022, is not clear whether it creates a protected property interest in continued

11  employment at a specific position within a municipal police department.[10]  Nor has Lane

12  referenced any Arizona court that has considered the question.  (*See* Doc. 65 at 15.)  Since

13  Lane fails to reference any case law that reinforces his alleged property interest in

14  continued employment, he fails to raise a genuine issue of material fact as to whether

15  existing precedent has placed the statutory question beyond debate.[11]   As such, Lane's

16  property interest in his captain position under Arizona law is not one that every reasonable

17  official would know, and the individual Defendants are entitled to qualified immunity on

18  this claim.

19  **V.**      **Individual Liability**

20        To be individually liable under section 1983, a defendant must have had "personal

21  participation in the alleged rights deprivation."  *Jones v. Williams*, 297 F.3d 930, 934 (9th

22  Cir. 2002).  A defendant deprives another of a constitutional right if he "does an affirmative

23  act, participates in another's affirmative acts, or omits to perform an act which he is legally

24  

---

25  [10] *See Blunt v. Town of Gilbert*, No. CV-23-02215, 2024 WL 2722167, at *3 (D. Ariz. May
26  28, 2024) (observing that the Peace Officers' Bill of Rights was initially passed in 2014 and amended in 2022).

27  [11] Even if Lane meant to assert that *Brady v. Gebbie*, 859 F.2d 1543, 1553 (9th Cir. 1988), is long-standing Ninth Circuit precedent that establishes his *property* interest violation, the
28  case, which interpreted Oregon law, is insufficient to place the Arizona statutory issue beyond debate.

required to do that *causes* the deprivation of which the plaintiff complains." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (cleaned up). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.* When multiple officers act to cause the plaintiff's alleged constitutional violation, each officer's individual liability is predicated upon his "integral participation" in the alleged violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007). "Integral participation" does not require that each officer's actions themselves rise to the level of a constitutional violation. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). However, "it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn*, 485 F.3d at 481 n.12.

At this point in the Court's analysis, the only remaining claim that implicates the individual Defendants is Lane's First Amendment retaliation claim. Lane's due process liberty interest claim has been dismissed, and the Court has determined that the individual Defendants are qualifiedly immune from Lane's due process property interest claim. That said, Defendants argue that neither Assistant Chief Hall nor Deputy Chief Kasmar can be held individually liable for Lane's alleged unlawful demotion because Chief Magnus was the sole person who had the authority to make that decision, and he did not delegate that authority. (Doc. 60 at 14.) In response, Lane argues that while Magnus may have made the final decision regarding Lane's demotion, it was a decision shared by his deputy and assistant chiefs. (Doc. 65 at 16.) Believing Lane's evidence and drawing all justifiable inferences in his favor, the Court finds that there is sufficient evidence in the record to create a genuine issue of material fact as to whether Assistant Chief Hall and Deputy Chief Kasmar personally participated in Lane's alleged unlawful demotion. The Court evaluates the evidence implicating Hall and Kasmar in the demotion in turn.

### A.    Assistant Chief Hall

Lane provides undisputed evidence that Assistant Chief Hall, and other executive leadership team members, pressured him to change his findings concerning the officer-

involved shooting, (Doc. 66, PSOF ¶¶ 15-17), issued a memorandum contradicting his findings, (*id.* PSOF ¶ 21), and prepared and issued a negative performance evaluation in connection with his demotion, (*id.* PSOF ¶¶ 31-33).[12]  Hall also participated in a meeting where Lane's demotion was discussed among Chief Magnus, Deputy Chief Kasmar, and others, and there was a unanimous consensus to demote Lane.  (Doc. 61-5 at 48:25-52:9.)  Finally, Hall required Lane to initial the department's revised use-of-force policy after the civil service commission affirmed Lane's position that the officer's use of force was within policy.  (Docs. 66, PSOF ¶¶ 51-54; 67-4 at 8-9.)  This evidence is sufficient to create a genuine issue of material fact as to whether Assistant Chief Hall personally participated in Lane's unlawful demotion.  As such, Defendants' summary judgment motion concerning Assistant Chief Hall's individual liability is denied.

### B.    Deputy Chief Kasmar

It is an undisputed fact Deputy Chief Kasmar threatened to demote Lane if he did not change his use-of-force findings in the officer involved shooting.  (Doc. 66, PSOF ¶ 26.)  It is also an undisputed fact that Kasmar and Hall then personally informed Lane he would be demoted, effective August 16, 2020.  (*Id.* PSOF ¶ 31.)  Finally, it is undisputed that Kasmar was present when Chief Magnus, Assistant Chief Hall, and other leadership team members discussed Lane's demotion and the decision to demote him was unanimous. (Doc. 61-5 at 48:25-52:9, 155:15-20.)  This evidence is sufficient to create a genuine issue of material fact as to whether Deputy Chief Kasmar personally participated in Lane's unlawful demotion.  As such, Defendants' summary judgment motion concerning Deputy Chief Kasmar's individual liability is denied.

### VI.    *Monell* Claims Survive

A municipality may be held liable for civil rights violations when action pursuant to official municipal policy causes a constitutional tort.  *Monell v. Dep't of Soc. Servs. of*

---

[12] Under Federal Rule of Civil Procedure 56, a party asserting that a fact cannot be genuinely disputed must support the assertion by citing to particular parts of materials in the record, which may include evidence filed by the opposing party. Fed. R. Civ. P. 56(c)(1)(A).

*City of N.Y.*, 436 U.S. 658, 691 (1978). There are three situations in which isolated constitutional violations are sufficient to establish a municipal policy. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). One of those situations is where the person causing the violation has "final policymaking authority." *Id*. Whether an official has final policymaking authority is a question of state law for the court to decide. *Id*.

It is undisputed that Chief Magnus demoted former captain Justin Lane in August 2020, and that Magnus is a final policymaker for purposes of establishing *Monell* liability. (Doc. 60 at 16-17.) The Court has determined that whether Lane was demoted for unlawful retaliation and whether he received proper procedural protection for his demotion are genuine issues of material fact for a jury to decide. As such, the city of Tucson cannot escape *Monell* liability for the alleged unconstitutional acts of one of its officials with final policymaking authority, and Defendants' summary judgment motion on the issue is denied.

## CONCLUSION

As a former police captain with the Tucson Police Department, Justin Lane authored a memorandum and official report that was critical of an internal investigation's findings against an officer involved in a public shooting. Lane also expressed his criticism at a civil service commission hearing on behalf of the officer who had since been terminated. The officer was exonerated and restored to his position, but weeks before the hearing, Lane was demoted. Believing Lane's evidence, and drawing all justifiable inferences in his favor, Lane's claims that he was unlawfully demoted in retaliation for his protected speech and that he was deprived of a protected property interest without sufficient procedural due process survive summary judgment and will go to a jury. Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 60) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Defendants' summary judgment motion is granted as to the merits of Plaintiff's Fourteenth Amendment liberty interest claim and to the qualified immunity of the individual Defendants on Plaintiff's Fourteenth Amendment property interest claim.

1   **IT IS FURTHER ORDERED** that Defendants' summary judgment motion is

2   denied as to the merits of Plaintiff's First Amendment retaliation claim, the merits of

3   Plaintiff's Fourteenth Amendment property interest claim, the qualified immunity of the

4   individual Defendants on Plaintiff's First Amendment retaliation claim, and the individual

5   liability of the Defendants on Plaintiff's First Amendment retaliation claim. Defendants'

6   summary judgment motion on the issue of *Monell* liability as it applies to the surviving

7   constitutional claims is also denied.

8   **IT IS FURTHER ORDERED** that the following claims will proceed to trial: (i)

9   First Amendment retaliation against the city of Tucson, Chief Magnus, Assistant Chief

10  Hall, and Deputy Chief Kasmar; and (ii) unlawful deprivation of a property interest against

11  the city of Tucson.

12

13  Dated this 31st day of December, 2024.

14

15

16  _____

17  Honorable Bruce G. Macdonald
    United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28